## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

TALISHA VALDEZ, on behalf of herself
and others similarly situated, and
JENNIFER BLACKFORD, on behalf of herself
and others similarly situated,

        Plaintiffs,

                                          Case No. 21-cv-783 MV/JHR

vs.

MICHELLE LUJAN GRISHAM,
Officially and Individually, Acting Under the Color of Law,
and
DAVID SCRASE,
Officially and Individually, Acting Under the Color of Law,

        Defendants.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on Plaintiffs' Verified Class Action Complaint for Civil Rights Violations Under 42 U.S.C.A. § 1983; Violations of Rights Protected by the New Mexico Civil Rights Act; Emergency Request for a Temporary Restraining Order; Request for Preliminary Injunction, Permanent Injunctive Relief and Damages (the "Complaint") [Doc. 1]. The Court, having considered the Complaint and the relevant law, finds that Plaintiffs' requests for a temporary restraining order and a preliminary injunction are not well-taken and will be denied.

## BACKGROUND

Since its emergence last year, the novel coronavirus 2019, or Sars-CoV-2, the virus that causes COVID-19, has spread exponentially through the world, and New Mexico has been no exception. Doc. 13 at 3. The ease and rapidity with which COVID-19 spreads and its potentially

severe symptoms create a frightening potential for mass deaths and an overloaded healthcare system.  *Id.* at 4.  During the winter of 2020-21, the United States averaged nearly 200,000 new cases and 4,000 COVID-19-related deaths every day.  *Id.* at 4-5.  One in five New Mexicans who were hospitalized for COVID-19 passed away.  *Id.* at 5.

In February 2020, the United States Department of Health and Human Services ("HHS") declared a public emergency and instructed the United States Food and Drug Administration ("FDA") to grant emergency use authorizations ("EUA") for "medical devices and interventions" to combat the pandemic, including vaccines.  *Id.* at 6.  The FDA issued detailed guidance to vaccine manufacturers, requiring a determination that the vaccine's benefits outweigh its risks based on data from at least one well-designed Phase 3 clinical trial that demonstrates the vaccine's safety and efficacy in a clear and compelling manner.  *Id.*

Three vaccine candidates emerged as frontrunners:  Pfizer/BioNTech and Moderna's two-dose mRNA vaccines, and Johnson & Johnson's ("J&J") single-dose viral vector vaccine. *Id.*  By the time Pfizer, Moderna, and J&J applied for EUA status (which, for Pfizer and Moderna, was in November 2020, and for J&J, was in February 2021), each vaccine had undergone significant testing.  *Id.* at 6-7.  After a team of representatives from across the FDA reviewed the data submitted by each manufacturer and independently assessed the risks and benefits of the vaccines, the FDA granted EUA, for individuals 16 and older, to Pfizer and Moderna's vaccines in December 2020 and to J&J's vaccine in February 2021, noting that each had met the expectations set out in the FDA's comprehensive guidance.  *Id.* at 7.  Pfizer's vaccine later received EUA for individuals 12 and older, and on August 23, 2021, received full FDA approval for individuals 16 and older.  *Id.* at 8.

Since the three vaccines received EUA status, over 368 million doses have been administered and over 173 million Americans have been fully vaccinated. *Id.* Comprehensive data collected since the three vaccines received EUA status demonstrates that they are safe and highly effective in preventing infection and severe illness, and that serious adverse side effects from the vaccines are exceedingly rare. *Id.* at 8-9. Further, the immunity provided by the vaccines is significantly more robust than natural immunity gained following infection. *Id.* at 9.

In late 2020, the "Delta" variant, a highly infectious and possibly more deadly strain of the coronavirus, appeared in India; by mid-June of 2021, the Centers for Disease Control and Prevention ("CDC") had labeled it a "variant of concern." *Id.* The Delta variant now accounts for virtually all new infections in the United States – including in New Mexico – and is believed to be twice as contagious as previous variants. *Id.* Studies indicate that individuals infected with the Delta variant are more likely to be hospitalized than those infected with other strains. *Id.* While the Delta variant is more likely to cause "breakthrough" infections than other variants, the vaccines still provide strong protection against serious illness and death in individuals who contract the Delta variant. *Id.* at 10.

Although case rates in New Mexico had begun to drop dramatically, the numbers rose rapidly with the rise of the Delta variant. *Id.* at 11. Back in June, there were approximately 60 new cases a day but by mid-August, there were nearly 900 new cases a day – a fifteenfold increase. *Id.* As a result, hospitals are again operating over their capacity to accommodate the surge of infected New Mexicans, the majority of whom are not vaccinated. *Id.*

To stem the tide of new cases and ease the pressure on our hospitals, on August 17, 2021, New Mexico Department of Health Acting Secretary David R. Scrase, M.D., issued "Public Health Emergency Order Requiring All School Workers Comply with Certain Health

Requirements and Requiring Congregate Care Facility Workers, Hospital Workers, and Employees of the Office of the Governor Be Fully Vaccinated" (the "PHO").  Doc. 1-2.  In relevant part, the PHO requires all "hospital workers . . . to be fully vaccinated against COVID-19 unless they qualify for an exemption."  *Id.* at 3-4.  The PHO also requires that "[a]ll persons who are eligible to receive a COVID-19 vaccine and enter the grounds of the New Mexico State Fair . . . provide adequate proof of being fully vaccinated against COVID-19 . . . unless the individual qualifies for an exemption."  *Id.* at 5.  Both hospital workers and individuals who seek entry into the State Fair "may be exempt from the COVID-19 vaccination requirement . . . if they have a qualifying medical condition which immunization would endanger their health, or they are entitled . . . to a disability-related reasonable accommodation or a sincerely held religious belief accommodation."  *Id.* at 4, 5-6.  A religious belief exemption may be supported by "a statement regarding the manner in which the administration of a COVID-19 vaccine conflicts with the religious observance, practice, or belief of the individual."  *Id.* at 4-5, 6.  The PHO specifically indicates that the vaccine requirements set forth therein are based on the following scientific and medical evidence:  "the currently available COVID-19 vaccines are safe and the most effective way of preventing infection, serious illness, and death"; "widespread vaccination protects New Mexico's health care system as vaccines decrease the need for emergency services and hospitalization"; and "the refusal to receive the COVID-19 vaccine not only endangers the individual but the entire community, and further jeopardizes the progress the State has made against the pandemic by allowing the virus to transmit more freely and mutate into more transmissible or deadly variants."  Doc. 1-2.

On August 19, 2021, Plaintiffs commenced the instant action.  Named Plaintiff Jennifer Blackford is a registered nurse employed by Presbyterian.  Doc. 1-3 ¶ 2.  She asserts that the

PHO "requires that [she] be terminated if [she] refuse[s] to be vaccinated for COVID-19," and that, based on her "medical training and her own independent research," she is "opposed to receiving the EUA covid vaccines." *Id.* ¶¶ 4-5. Named Plaintiff Talisha Valdez, on behalf of herself and her 11- and 12-year-old daughters, has contracted to exhibit their animals at the New Mexico State Fair. Doc. 1-4 ¶¶ 2, 6. She asserts that the PHO "prohibits [her] and [her] children from attending the New Mexico State Fair and showing their animals," and that she has chosen "not to be vaccinated" and "to refuse to have [her] child injected with an experimental EUA vaccine." *Id.* at ¶¶ 9, 12. Together, Plaintiffs allege that, unless this Court enters a temporary restraining order and preliminary injunction, under the PHO, "New Mexicans will be forced to take an experimental vaccine in order to retain their employment and will forever lose the ability to exhibit their unique animals at the New Mexico State Fair." Doc. 1 at 22. In their Complaint, Plaintiffs request "a temporary restraining order to prohibit Defendants from enforcing public health orders against the Plaintiffs and other putative class members that are similarly situated," and a preliminary injunction "to prohibit Defendants from enforcing public health orders in the arbitrary and capricious manner and fashion engaged by Defendants." *Id.* at 15.

In an Order entered on August 23, 2021, the Court denied Plaintiffs' request for entry of an emergency order on an *ex parte* basis, explaining that Plaintiffs did not meet the requirements of Rule 65(b)(1) of the Federal Rules of Civil Procedure that would entitle them to a temporary restraining order "without written or oral notice to the adverse party or its attorney." Doc. 3. The Court, however, set an expedited briefing schedule on Plaintiffs' request for preliminary relief. *Id.* Later that day, Plaintiffs filed a motion asking the Court to reconsider its decision. Doc. 4. In an Order entered on August 25, 20121, the Court denied Plaintiffs' motion, explaining that Plaintiffs provided no basis for the Court to use its inherent authority to

reconsider its decision to refrain from issuing an order enjoining enforcement of the PHO without providing Defendants with an opportunity to respond.  Doc. 10.  In accordance with the expedited briefing schedule set by the Court, Defendants filed a response in opposition on August 30, 2021, Doc. 13, and Plaintiffs' reply followed on September 1, 2021.  Doc. 14.

### STANDARD

"A preliminary injunction is an extraordinary remedy, the exception rather than the rule." *Free the Nipple-Fort Collins v. City of Fort Collins, Colo.*, 916 F.3d 792, 797 (10th Cir. 2019). To obtain a "typical" preliminary injunction, the moving party must prove four things: (1) "that she's substantially likely to succeed on the merits"; (2) "that she'll suffer irreparable injury if the court denies the injunction"; (3) "that her threatened injury (without the injunction) outweighs the opposing party's under the injunction"; and (4) "that the injunction isn't adverse to the public interest." *Id.* (citation omitted).[1]  "The third and fourth factors 'merge' when, like here, the government is the opposing party." *Aposhian v. Barr*, 958 F.3d 969, 978 (10th Cir. 2021) (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)).  "[B]ecause a preliminary injunction is an extraordinary remedy, the [movant's] right to relief must be clear and unequivocal." *Id.* (quoting *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256, 1261 (10th Cir. 2004) (internal quotation marks omitted)).  Notably, the movant "must" satisfy her burden as to each element; the elements "do not establish a balancing test – each must be satisfied independently,

---

[1] As noted above, Plaintiffs request both a temporary restraining order and a preliminary injunction.  Where, as here, there has been notice to the adverse party, a motion for a temporary restraining order "may be treated by the court as a motion for preliminary injunction."  13 Moore's Federal Practice § 65.31 (2920).  Further, the standard applicable to a motion for a preliminary injunction is the same as that applicable to a motion for a temporary restraining order.  *Firebird Structures, LLC v. United Bhd. of Carpenters & Joiners of Am., Local Union No. 1505*, 252 F. Supp. 3d 1132, 1156 (D.N.M. 2017).  Accordingly, the Court analyzes Plaintiffs' requests for temporary and preliminary relief together as a request for a preliminary injunction.

and the strength of one cannot compensate for the weakness of another." *Peterson v. Kunkel*, 492 F. Supp. 3d 1183, 1192 (D.N.M. 2020) (citing *Diné Citizens Against Ruining Our Env't v. Jewell*, 839 F.3d 1276, 1282 (10th Cir. 2016)).

Courts, however, "'disfavor' some preliminary injunctions and so require more of the parties who request them." *Free the Nipple*, 916 F.3d at 797 (citing *Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1258-59 (10th Cir. 2005)). Specifically, a "disfavored preliminary injunction[]" is one that does not "merely preserve the parties' relative positions pending trial," but instead "may exhibit any of three characteristics": (1) "it mandates action (rather than prohibiting it)"; (2) "it changes the status quo"; or (3) "it grants all the relief that the moving party could expect from a trial win." *Free the Nipple*, 916 F.3d at 797. To obtain a "disfavored" preliminary injunction, the moving party "faces a heavier burden on the likelihood-of-success-on-the merits and the balance-of-harms factors," namely, she must make a "strong showing that these tilt in her favor." *Id.* (citation omitted).

## DISCUSSION

Defendants argue that the injunction Plaintiffs seek, namely, "to prohibit Defendants from enforcing public health orders," is disfavored for two reasons: (1) Plaintiffs seek the same injunctive relief sought in their Complaint, and thus "seek virtually all the relief they could be awarded at the end of trial on the merits"; and (2) an injunction would "force Defendants to affirmatively alter the PHO and the State's enforcement of it," thus changing the status quo. Doc. 13 at 15-16. The Court is inclined to agree that the requested preliminary injunction is disfavored. *See Peterson*, 492 F. Supp. 3d at 1193 (finding that the requested preliminary injunction, namely, requiring defendants to allow private schools to conduct in-person learning at 50% capacity, was disfavored because it would change the status quo set by the challenged

7

public health order, which imposed a 25% capacity limitation on private schools, and because the requested preliminary relief was "an exact overlay of relief sought" in plaintiffs' complaint). The Court, however, need not decide whether the heightened disfavored-injunction standard applies, thus requiring "strong" showings from Plaintiffs on the first and third factors, because, as set forth herein, Plaintiffs fail to make even the baseline showing on any of the four factors as required to obtain a "typical" injunction.

I.    Likelihood of Success on the Merits

In their Complaint, Plaintiffs assert that the PHO's vaccine requirements violate the Federal Food, Drug, and Cosmetic Act ("FDCA"), their Fourteenth Amendment rights to equal protection, substantive due process, and procedural due process, their rights under Article 1, Section 10 of the United States Constitution, and their rights under the New Mexico Constitution.  Doc. 1 at 9-14.  Plaintiffs, however, have failed to establish that any of these claims are likely to succeed on the merits.

A.    FDCA Claims

According to Plaintiffs, by mandating that certain individuals be vaccinated against COVID-19, the PHO violates the FDCA, because the provisions of the FDCA relevant to medical products under an EUA "state[] that where a medical product is 'unapproved' then no one may be mandated to take it."  Doc. 1 ¶ 54 (quoting 21 U.S.C. § 360bbb-3(e)).  As an initial matter, and despite Plaintiffs' protestation to the contrary, the FDA has now given its full approval – not just emergency use authorization – to the Pfizer vaccine as administered to individuals 16 years of age and older.  *See FDA News Release,* https://www.fda.gov/emergency-preparedness-and-response/coronavirus-disease-2019-covid-19/comirnaty-and-pfizer-biontech-covid-19-vaccine ("On August 23, 2021, the FDA approved the first COVID-19 vaccine. The

vaccine has been known as the Pfizer-BioNTech COVID-19 Vaccine, and will now be marketed

as Comirnaty, for the prevention of COVID-19 disease in individuals 16 years of age and

older.").   Accordingly, the provisions of the FDCA quoted by Plaintiff, which are applicable

only to medical products under an EUA, are not applicable to the administration of the Pfizer

vaccine to individuals 16 years of age and older.

Further, while the statutory provisions quoted by Plaintiffs apply to the Moderna vaccine,

the J&J vaccine, and the Pfizer vaccine as administered to individuals under the age of 16, those

provisions nowhere prevent the state, or any other entity, from requiring certain individuals to be

vaccinated against COVID-19.  Rather, in relevant part, the FDCA requires that, for medical

products under an EUA, "HHS must establish conditions to facilitate informed consent."

*Klaassen v. Trustees of Indiana Univ. ("Klaassen I")*, __ F. Supp. 3d __, No. 21-cv-238, 2021

WL 3073926, at *25 (N.D. Ind. July 18, 2021), *aff'd*, 7 F.4th 592 (7th Cir. 2021) (citing 21

U.S.C. § 360bbb-3(e)(1)(A)(ii)).  Specifically, "HHS must ensure that individuals taking the

vaccine are informed that the Secretary has authorized the emergency use of the product," "of the

significant known and potential benefits and risks of such use, and of the extent to which such

benefits and risks are unknown," and "of the option to accept or refuse administration of the

product, of the consequences, if any, of refusing administration of the product, and of the

alternatives to the product that are available and of their benefits and risks."  *Klaassen I*, 2021

WL 3073926, at *25 (quoting 21 U.S.C. § 360bbb-3(e)(1)(A)(ii)).  This informed consent

requirement "only applies to medical providers."  *Klaassen I*, 2021 WL 3073926, at *25.  Here,

Defendants are not "directly administering the vaccine" to hospital workers and individuals who

seek entry into the State Fair; instead, they are requiring such individuals "to obtain the vaccine

from a medical provider and to attest that they have been vaccinated, save for certain

exemptions." *Id.*  The individuals "will be informed of the risks and benefits of the vaccine and of the option to accept or refuse the vaccine by their medical providers." *Id.*

Accordingly, to the extent that the vaccines at issue here remain subject to the EUA provisions of the FDCA, the PHO does not run afoul of those provisions.  *Id.; see also Bridges v. Hous. Methodist Hosp.*, No. 21-H-1774, 2021 WL 2399994, at * (S.D. Tex. June 12, 2021) (rejecting hospital employee's claim, virtually identical to Plaintiffs' claim here, that under FDCA "no one can be mandated to receive 'unapproved' medicines in emergencies," noting that the FDCA "confers certain powers and responsibilities to the Secretary of Health and Human Services in an emergency," "neither expands nor restricts the responsibilities of private employers," and "does not confer a private opportunity to sue the government");  Dep't of Justice, *Whether Section 564 of the Food, Drug and Cosmetic Act Prohibits Entities from Requiring the Use of a Vaccine Subject to an Emergency Use Authorization* at 2 (July 6, 2021), https://www.justice.gov/olc/file/1415446/download (finding that informed consent provision in FDCA "specifies only that certain information be provided to potential vaccine recipients and does not prohibit entities from imposing vaccination requirements").  It follows that Plaintiffs are unlikely to succeed on the merits of their FDCA claims.

   B.   Substantive Due Process Claims

Plaintiffs generally allege that they "have [constitutionally] protected liberty interests" "in their right to live without governmental interference," their right "to bodily integrity," their right "to raise their children as they see fit," and their right "to engage in their chosen professions," and that because the PHO is "not narrowly tailored," it violates these substantive due process rights.  Doc. 1 ¶¶ 63, 65.  Here, "plaintiffs advance a substantive due process challenge to a *legislative* enactment," namely, the PHO.  *Dias v. City & Cty. of Denver*, 567 F.3d

1169, 1182 (10th Cir. 2009) (emphasis in original); *see also ETP Rio Rancho Park, LLC, v.*

*Grisham*, __ F. Supp. 3d __, No. 21-cv-92, 2021 WL 765364, at *41 (D.N.M. Feb. 26, 2021)

(noting that, "[although the NMDOH – a state executive agency" – issued the challenged PHO,

that PHO was "akin to a legislative action"). Accordingly, a "two-part substantive due process

framework is applicable." *Dias*, 567 F.3d at 1182; *see also ETP Rio Rancho Park*, 2021 WL

765364, at *41 (applying the two-part approach to trampoline park owners' substantive due

process challenge to PHO that limited operations for recreational facilities). First, the Court

must "carefully describe the asserted fundamental liberty interest." *Dias*, 567 F.3d at 1182

(citation omitted). Second, the Court must decide "whether that interest is 'deeply rooted in this

Nation's history and tradition' and 'implicit in the concept of ordered liberty, such that neither

liberty nor justice would exist if they were sacrificed.'" *Id.* (quoting *Washington v. Glucksberg,*

521 U.S. 702, 720–21 (1997)). If the Court determines that the rights asserted are fundamental,

the Fourteenth Amendment "forbids the government to infringe [those] rights at all, . . . unless

the infringement is narrowly tailored to serve a compelling state interest." *Glucksberg*, 521 U.S.

at 721. If the legislative (or executive) action at issue "does not implicate a fundamental right, it

must nonetheless bear a rational relationship to a legitimate government interest." *Dias*, 567

F.3d at 1182 (citation omitted).

      Here, Plaintiffs' assertion of broadly defined rights falls short of providing the "careful

description of the asserted fundamental liberty interest" required under *Glucksberg* to establish a

fundamental right. *ETP Rio Rancho Park*, 2021 WL 765364, at * 42. Plaintiffs do not explain

how the rights allegedly violated by the PHO are *fundamental*; indeed nowhere, do they address

how the right to work in a hospital or attend the State Fair, unvaccinated and during a pandemic,

is "deeply rooted in this Nation's history and tradition." *Id.*

11

In support of their request for preliminary relief, Plaintiffs focus solely on the right to "engage in their chosen profession," which they contend "is deeply rooted in our nation's legal and cultural history and has long been recognized as a component of the liberties protected by the Fourteenth Amendment." Doc. 14 at 6. But the Tenth Circuit has unequivocally held that the "right to practice in [one's] chosen profession . . . does not invoke heightened scrutiny." *Guttman v. Khalsa*, 669 F.3d 1101, 1118 (10th Cir. 2012). "[A]lthough 'the liberty component of the Fourteenth Amendment's Due Process Clause includes some generalized due process right to choose one's field of private employment,' this right is 'subject to reasonable government regulation.'" *Id.* (quoting *Conn v. Gabbert,* 526 U.S. 286, 291-92, (1999)); *see also Collins v. Texas,* 223 U.S. 288, (1912) (the right to practice medicine is not a fundamental right). Thus, while Plaintiffs may "have a right to engage in their chosen professions," governmental infringement on this right will be "presumed to be valid" so long as it is "rationally related to a legitimate state interest." *Klaassen I*, 2021 WL 3073926, at *17 (quoting *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985)). Indeed, federal courts have consistently held that vaccine mandates do not implicate a fundamental right and that rational basis review therefore applies in determining the constitutionality of such mandates. *Klaassen v. Trustees of Indiana Univ. ("Klaassen II")*, 7 F.4th 592 (7th Cir. 2021) (rejecting assertion by plaintiffs, who challenged Indiana University's mandatory COVID-19 vaccine requirement, that the rational basis standard does not offer enough protection for their interests, indicating that the court "must apply the law established by the Supreme Court" in *Jacobson v. Massachusetts,* 197 U.S. 11 (1905), which, in holding that "a state may require all members of the public to be vaccinated against smallpox," "shows that plaintiffs lack" a fundamental right to be free from mandatory vaccine measures); *Klaassen I*, 2021 WL 3073926, at *24 (collecting cases demonstrating "the

12

consistent use of rational basis review to assess mandatory vaccination measures," and, in light of "a century's worth of rulings, declining to "extend substantive due process to recognize" a fundamental right to be free from COVID-19 vaccination requirements); *Harris v. Univ. of Mass.*, No. 21-cv-11244, 2021 WL 3848012, at *6 (D. Mass. Aug. 27, 2021) ("[T]he case [challenging a policy requiring students who seek to be on campus to be vaccinated prior to fall semester] "commends a deferential standard for analyzing Fourteenth Amendment challenges to generally applicable public health measures like the one here"); *Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 67 (2020) (Gorsuch, J., concurring) (explaining that *Jacobson* is "essentially . . . rational basis review").

"To satisfy the rational basis test, the [challenged governmental action] need only be rationally related to a legitimate government purpose." *Powers v. Harris,* 379 F.3d 1208, 1215 (10th Cir. 2004). Rational basis review "is highly deferential toward the government's actions. The burden is on the plaintiff to show the governmental act complained of does not further a legitimate state purpose by rational means." *Seegmiller v. LaVerkin City*, 528 F.3d 762, 772 (10th Cir. 2008). The government's decision "must be upheld if any state of facts either known or which could reasonably be assumed affords support for it. Second-guessing by a court is not allowed." *Powers*, 379 F.3d at 1216-17. Moreover, "rational-basis review does not give courts the option to speculate as to whether some other scheme could have better regulated the evils in question." *Id.* at 1217. The Court "will not strike down [governmental action] as irrational simply because it may not succeed in bringing about the result it seeks to accomplish, or because the statute's classifications lack razor-sharp precision." *Id.* Nor will the Court "overturn [an order] on the basis that no empirical evidence supports the assumptions underlying the [governmental] choice." *Id.* Indeed, the Court is "not bound by the parties' arguments as to

13

what legitimate state interests the [order] seeks to further," but instead "is obligated to seek out

other conceivable reasons for validating a state [order]."  *Id.*

  The Court finds that the PHO meets the rational basis test.  "Vaccination requirements,

like other public-health measures, have been common in this nation."  *Klaassen*, 7 F.4th at 593.

In *Jacobson,* the Supreme Court held that "a community has the right to protect itself against an

epidemic of disease which threatens the safety of its members."  197 U.S. at 27.  Based on that

premise, the Supreme Court declined to find unconstitutional, on either substantive due process

or equal protection grounds, a Cambridge, Massachusetts regulation that required all adult

inhabitants of that city, *without exception*, to be vaccinated against smallpox.  The Supreme

Court explained that "when the regulation in question was adopted smallpox, according to the

recitals in the regulation adopted by the board of health, was prevalent to some extent in the city

of Cambridge, and the disease was increasing."  *Id.*  The Court further explained that, "in view of

the methods employed to stamp out the disease of smallpox," no one could "confidently assert

that the means prescribed by the state to that end has no real or substantial relation to the

protection of the public health and the public safety."  *Id.* at 31.  The Court noted that while it did

"not decide, and [could not] decide, that vaccination is a preventive of smallpox," it took

"judicial notice of the fact that this is the common belief of the people of the state, and, with this

fact as a foundation," held that Cambridge's compulsory vaccine statute was "a health law,

enacted in a reasonable and proper exercise of the police power."  *Id.* at 35.  The Court then

found that, since "vaccination, as a means of protecting a community against smallpox, finds

strong support in the experience of this and other countries, no court . . . is justified in

disregarding the action of the legislature simply because in its or their opinion that particular

method was – perhaps, or possibly – not the best either for children or adults."  *Id.*

In reaching its decision, the Supreme Court considered and rejected the defendant's "offers of proof" of "those in the medical profession who attach little or no value to vaccination as a means of preventing the spread of smallpox, or who think that vaccination causes other diseases of the body." *Id.* at 30.  The Court explained that it assumed that the legislature "was not unaware of these opposing theories," and that it was for the legislature, *and not the court*, to "determine which one of the two modes was likely to be the most effective for the protection of the public against disease." *Id.*  Indeed, the Court explained that the legislature "could not properly abdicate its function to guard the public health and safety," and thus was compelled, of necessity, to choose between opposing theories on how best to "meet and suppress the evils of a smallpox epidemic that imperiled an entire population." *Id.* at 30-31.  The Court emphasized that the "possibility that the belief [in the efficacy of vaccines] may be wrong, and that science may yet show it to be wrong," was "not conclusive; for the legislature has the right to pass laws which, according to the common belief of the people, are adapted to prevent the spread of contagious diseases." *Id.* at 35.

Ultimately, the Court refused to allow the defendant to "claim [] an exemption" from the vaccination statute based on his offers of proof regarding the "evil" of vaccines, as doing so would "strip the legislative department of its function to care for the public health and the public safety when endangered by epidemics of disease." *Id.* at 37.  And in so refusing, the Court noted that it was "not prepared to hold that a minority, residing or remaining in any city or town where smallpox is prevalent, and enjoying the general protection afforded by an organized local government, may thus defy the will of its constituted authorities, acting in good faith for all, under the legislative sanction of the state." *Id.*  The Court concluded:  "We are unwilling to hold it to be an element in the liberty secured by the Constitution of the United States that one person,

or a minority of persons, residing in any community and enjoying the benefits of its local government, should have the power thus to dominate the majority when supported in their action by the authority of the state."  *Id.*

With its decision in *Jacobson*, the Supreme Court "settled that it is within the police power of a state to provide for compulsory vaccination."  *Zucht v. King*, 260 U.S. 174, 176, (1922).  In the context of the current pandemic, courts have applied *Jacobson* to find that mandatory vaccine policies at state universities – all of which, like the vaccine policy at issue here, provide for medical, disability, and religious belief exemptions – meet the rational basis test.  *See Klaassen I*, 2021WL3073926, at *27 (noting that, in light of the fact that the "vaccination campaign has markedly curbed the pandemic," "Indiana University insisting on vaccinations for its campus communities," thereby "stemming illness, hospitalizations, or deaths at the university level[,] hardly proves irrational");  *Harris,* 2021 WL 384012, at *6 (holding that university's decision to mandate vaccines was based "upon both medical and scientific evidence and research and guidance, and thus is at least rationally related to" the "legitimate interests" of curbing the spread of COVID-19 and "returning students safely to campus"); *America's Frontline Doctors v. Wilcox*, No. 21-EDCV-1243, 2021 U.S. Dist. LEXIS 144477 (C.D. Cal. July 30, 2021) (holding that "there is clearly a rational basis for Defendants to institute the Policy requiring vaccination" to further the goal of facilitating the "protection of the health and safety of the University community," where the policy was "the product of consultation with UC infections disease experts and ongoing review of evidence from medical studies concerning the dangerousness of COVID-19 and emerging variants of concern, as well as the safety and effectiveness of the vaccines").  Applying *Jacobson* to the PHO's vaccine mandate, the Court reaches the same conclusion.

16

The governmental purpose of stemming the spread of COVID-19, especially in the wake of the Delta variant, is not only legitimate, but is "unquestionably a compelling interest." *Roman Cath. Diocese of Brooklyn*, 141 S. Ct. at 67. Other legitimate goals follow from that, including: (1) protecting "persons who may be extremely vulnerable to the virus and at high risk for poor outcomes," "children younger than 12 years" who are not eligible for vaccination, and "individuals who are not able to get vaccinated due to a contraindication . . . or persons who may be severely immunocompromised and not able to mount an effective immune response to the vaccine"; and (2) "significantly reduc[ing] the transmission of this virus from person to person" in order to "decrease the likelihood" of "new mutations in the viral genome that could possibly lead to more severe disease or even the ability to evade the current vaccines and anti-viral therapeutics." Doc. 13-1 ¶¶ 14, 20-21, 26. Following the research, recommendations, and guidance of several medical and scientific sources, including the CDC, the American Academy of Pediatrics, the American Academy of Family Practice, the Infectious Diseases Society of America, the New Mexico state public health lab, University of New Mexico, Los Alamos National Lab, and the Advisory Committee on Immunization Practices, Defendants have determined that the three vaccines – which are "extremely safe" and, even against the Delta variant, "highly effective" – "are the best tool we have to protect individuals and protect communities from [COVID-19]." Doc. 13-1 ¶¶ 15, 28. Notably, based on the scientific and medical research, Defendants have determined that vaccinating health care personnel is the "best tool" to protect patients who come into close contact with them – patients who "may be extremely vulnerable to the virus and at high risk for poor outcomes." *Id.* ¶ 14. Similarly, Defendants have determined that "the most effective way to stop transmission both to children younger than 12 years" and to "individuals who are not able to get vaccinated" "is to vaccinate

eligible family members and those in the community where they live." *Id.* ¶¶ 20-21.  Further, Defendants have determined that "[t]he best tool we have" to decrease the likelihood that new, more lethal mutations of the virus develop "is through protecting as many people as possible by vaccination." *Id.* ¶ 26.  Finally, Defendants have determined that "the immunity provided by vaccines may be more long-lasting compared to immunity gained following infection." *Id.* ¶ 39.

The vaccination requirements set forth in the PHO, thus grounded in medicine and science, are rationally related to Defendants' legitimate purpose of protecting our community "against an epidemic of disease [that] threatens the safety of its members." *Jacobson*, 197 U.S. at 27.  As was smallpox in 1905, COVID-19 is "prevalent to some extent" in New Mexico and, because of the Delta variant, "the disease [is] increasing." *Id.*  Since *Jacobson* was decided, the "methods employed to stamp out" diseases have continued to include vaccination, which, "as a means of protecting a community against smallpox [other diseases, and now, COVID-19], finds strong support in the experience of this and other countries." *Id.*  Accordingly, no one could "confidently assert that the means prescribed by the state to prevent the spread of COVID-19," namely, requiring certain individuals to be vaccinated, have "no real or substantial relation to the protection of the public health and the public safety." *Id.* at 31.  It follows that the PHO was "enacted in a reasonable and proper exercise of [Defendants'] police power." *Id.* at 35.  Indeed, "this case is easier than *Jacobson*," as *"Jacobson* sustained a vaccination requirement that lacked exceptions for adults," while the PHO has medical, disability, and religious belief exemptions, and "does not require every adult member of the public to be vaccinated, as Massachusetts did in *Jacobson*," but rather is targeted to those individuals most likely to impact vulnerable populations. *Klaassen II*, 7 F.4th at 593.

18

Plaintiffs decry the basis for the PHO as "technocratic selective science," and argue that it fails to take into account that "Covid-recovered individuals have equal to or better immunity response than vaccinated individuals." Doc. 14 at 2; Doc. 1 ¶ 13. But Plaintiffs' "disputes over the most reliable science" are of no moment to the instant analysis, as "the court doesn't intervene so long as [Defendants'] process is rational in trying to achieve public health." *Klaassen I*, 2021 WL 3073926, at * 38 (citing *Phillips v. City of New York*, 775 F.3d 538, 542 (2d Cir. 2015) ("[P]laintiffs argue that a growing body of scientific evidence demonstrates that vaccines cause more harm to society than good, but as *Jacobson* makes clear, that is a determination for the [policymaker], not the individual objectors.")). As did the Court in *Jacobson*, this Court assumes that Defendants are aware of "opposing theories" on the safety and efficacy of vaccines; and as did the Court in *Jacobson*, this Court finds, as it must, that it is for Defendants, and not the Court, to determine what "[is] likely to be the most effective [mode] for the protection of the public against disease." *Jacobson*, 197 U.S. at 30. Indeed, this is so regardless of whether "science may yet show" Defendants' belief in the efficacy of the COVID-19 vaccines "to be wrong," as Defendants have the right to enact orders "adapted to prevent the spread of contagious diseases." *Id.*

Plaintiffs also contend that the PHO represents an "offensive disregard for the civil rights of the unvaccinated to make their own decision about what to put in their bodies trusting the science they think is best and their own doctors to decide for themselves what is best for them." Doc. 14 at 3. But the *Jacobson* Court made clear that the Fourteenth Amendment does not grant individuals any such rights in the face of a state-imposed vaccine mandate. To the contrary, the Court explicitly refused to "hold it to be an element in the liberty secured by the Constitution of the United States that one person, or a minority of persons, residing in any community and

19

enjoying the benefits of its local government" should have the power [] to dominate the majority by "defy[ing] the will of its constituted authorities, acting in good faith for all, under the legislative sanction of the state." *Jacobson*, 197 U.S. at 38.  In short, by failing to accommodate Plaintiffs' (or their doctors') views on the COVID-19 vaccines, the PHO does not lack a rational relationship to a legitimate government purpose.  Indeed, to hold otherwise would "practically strip [Defendants] of [their] function to care for the public health and the public safety when endangered by epidemics of disease." *Id.* at 37.

For these reasons, the PHO meets the rational basis test.  Accordingly, Plaintiffs are unlikely to succeed on the merits of their substantive due process claims.

C.     Equal Protection Claims

Plaintiffs allege that Defendants are violating their equal protection rights because their "actions create a class of individuals who . . . are punished for being unvaccinated and discriminated against without any real justifiable basis and without providing them any alternative," and "[t]he PHO is not rationally related to achieving a compelling government purpose."  Doc. 1 ¶¶ 59, 60 (emphasis in original).  "Equal protection is essentially a direction that all persons similarly situated should be treated alike." *Dalton v. Reynolds*, 2 F.4th 1300, 1308 (10th Cir. 2021) (citation omitted).  "In order to assert a viable equal protection claim, plaintiffs must first make a threshold showing that they were treated differently from others who were similarly situated to them." *Barney v. Pulsipher*, 143 F.3d 1299, 1312 (10th Cir. 1998)). "Upon this showing, [plaintiffs] must then demonstrate that the state actor's differential treatment of [them] cannot pass the appropriate standard of scrutiny." *Dalton,* 2 F.4th at 1308.

"Different types of equal protection claims call for different forms of review." *Id.* "[U]nless a legislative classification either burdens a fundamental right or targets a suspect class,

it need only bear a rational relation to some legitimate end to comport with equal protection."
*Curley v. Perry*, 246 F.3d 1278, 1285 (10th Cir. 2001) (citation omitted).  As discussed above,
the PHO does not burden a fundamental right.  Nor does it target a suspect class, as it does not
"categorize persons based on suspect classifications, such as race and national origin," or "on
'quasi-suspect' classifications, such as gender and illegitimacy."  *Save Palisade FruitLands v.
Todd*, 279 F.3d 1204, 1210 (10th Cir. 2002) (citations omitted).  Accordingly, the Court applies
rational basis review, asking "whether the government's classification bears a rational relation to
some legitimate end."  *Dalton*, 2 F.4th at 1308.

As explained above in the context of Plaintiffs' substantive due process claims, the PHO
meets the rational basis test.  The PHO, including its classification of individuals as to whom
vaccination requirements apply, is grounded in medicine and science, and thus is rationally
related to Defendants' legitimate purpose of protecting our community "against an epidemic of
disease [that] threatens the safety of its members."  *Jacobson*, 197 U.S. at 27.  Accordingly,
Plaintiffs are unlikely to succeed on the merits of their equal protection claims.

D.     Procedural Due Process Claims

Plaintiffs allege that the PHO deprives them of "fundamental liberties without due
process of law."  Doc. 1 ¶ 73.  Because the PHO, however, "is generally applicable" to all
congregate care facility workers, hospital workers, school workers, State Fair attendees, and
Governor's office staff, Plaintiffs "are not entitled to [process] above and beyond the notice
provided by the enactment and publication of the [PHO] itself."  *Harris,* 2021 WL 3848012, at
*5 (citation omitted); *see also United States v. Locke*, 471 U.S. 84, 108 (1985) ("In altering
substantive rights through enactment of rules of general applicability, a legislature generally
provides constitutionally adequate process simply by enacting the statute, publishing it, and, to

the extent the statute regulates private conduct, affording those within the statute's reach a reasonable opportunity both to familiarize themselves with the general requirements imposed and to comply with those requirements."); *Oklahoma Educ. Ass'n v. Alcoholic Beverage Laws Enforcement Comm'n*, 889 F.2d 929, 936 (10th Cir. 1989) ("When the legislature passes a law which affects a general class of persons, those persons have all received procedural due process – the legislative process."); *Curlott v. Campbell*, 598 F.2d 1175, 1181 (9th Cir. 1979) ("[W]e doubt very much that procedural due process prior to reduction of benefits is required when an agency makes a broadly applicable, legislative-type decision."). Based on this principle, courts in this district have held that the public health orders issued by Defendants in response to the current pandemic do not implicate procedural due process. *See Hernandez v. Lujan Grisham*, 508 F. Supp. 3d 893, 977-981 (D.N.M. 2020); *Peterson*, 492 F. Supp. 3d at 1197-98. This Court agrees. Accordingly, Plaintiffs are unlikely to succeed on the merits of their procedural due process claims.

E.     Claims under Article I, Section 10 of the United States Constitution

Plaintiffs allege that Defendants' vaccine requirements "constitute[] a bill of attainder" and "impair" the contract entered into between Valdez and her children "to participate in the New Mexico State Fair junior livestock competitions" and Blackford's "employment contract," in violation of Article I, Section 10 of the United States Constitution. Doc. 1 ¶¶ 75-76. In their reply brief, Plaintiffs appear to abandon their theory that the PHO constitutes a bill of attainder, referring to Defendants' arguments refuting that theory as "a complete red herring." Doc. 14 at 7. Accordingly, the Court will consider only Plaintiffs' remaining argument under the Contracts Clause of Article I, Section 10 of the United States Constitution, namely that Defendants have impaired Plaintiffs' existing contracts by enacting the PHO. *Id.* at 8-9.

22

"The Contracts Clause restricts the power of States to disrupt contractual arrangements." *Sveen v. Melin*, 138 S. Ct. 1815, 1821 (2018).  It provides that "[n]o state shall . . . pass any . . . Law impairing the Obligation of Contracts." *Id.* (quoting U.S. Const., Art. I, § 10, cl. 1).  Not all laws affecting pre-existing contracts, however, violate the Clause.  *Sveen*, 138 S. Ct. at 1821.  The Supreme Court has articulated a "two-step test" to determine "when such a law crosses the constitutional line."  *Id.*  First, the Court asks whether the state law has "operated as a substantial impairment of a contractual relationship."  *Id.* at 1822.  In answering that question, the Court considers "the extent to which the law undermines the contractual bargain, interferes with a party's reasonable expectations, and prevents the party from safeguarding or reinstating his rights."  *Id.*  "If such factors show a substantial impairment," the Court next asks "whether the state law is drawn in an 'appropriate' and 'reasonable' way to advance 'a significant and legitimate public purpose.'"  *Id.* (quoting *Energy Reserves Group, Inc. v. Kansas Power & Light Co.,* 459 U.S. 400, 411–412 (1983)).

Here, Plaintiffs have failed to establish a "substantial impairment" of any contractual relationship.  Plaintiffs have not provided the Court with copies of any of the purported contracts at issue or cited to any provisions therein to demonstrate that the PHO undermines their contractual bargain, interferes with their reasonable expectations, or prevents them from safeguarding or reinstating their rights.  And indeed, the evidence available to the Court demonstrates to the contrary.

First, as Plaintiffs concede, Blackford's employer, Presbyterian, has instituted its own private vaccine mandate – a mandate that reaches more broadly than does the PHO – requiring its entire workforce to be vaccinated against COVID-19 in the absence of a qualifying exemption.  Colleen Heild, *Presbyterian requires vaccines for entire workforce of 13,000*, Santa

23

Fe New Mexican (Aug. 18, 2021), https://www.abqjournal.com/2420650/ presbyterian-requires-vaccines-for-entire-workforce-of-13000-ex-pnm-is-asking-all-staff-to-get-vaccinated-or-be-tested-weekly.html.  Plaintiffs contend that Presbyterian's mandate was implemented simply so that Blackford's "employer can remain compliant with the [] PHO," Doc. 14 at 8, but there is no support for this contention, as the PHO applies directly to individual workers rather than to the hospitals that employ them.  Nor is there any indication that, but for the PHO, Presbyterian would not have instituted its own vaccine requirements.  Notably, commenting on its mandate, Presbyterian's president and CEO, Dale Maxwell, stated, "We take care of some of the most vulnerable people in the state of New Mexico, . . . and I believe . . . we should take every measure possible to deliver the safest environment."  *Id.*  Maxwell further stated that Presbyterian made its own independent decision "to also include all other Presbyterian employees, including clinical, clerical and health plan employees," because "we believe at Presbyterian that vaccines are the best way to combat this pandemic . . . We know that vaccines reduce the spread of the infection and we know that vaccines reduce the illness of those that contract COVID-19.  Any action to increase vaccines in our community, we support."  *Id.*  Thus, Blackford has no "reasonable expectation" that she would be entitled to continue her employment without being vaccinated, and thus cannot claim that the PHO substantially impairs her contractual rights.

Similarly, while Plaintiffs allege that Valdez has been deprived of the benefit of her contract with Expo New Mexico because her children cannot participate in the New Mexico State Fair junior livestock competitions, Expo New Mexico cancelled the 2021 New Mexico State Fair Junior Livestock Shows and Sale.  *See* New Mexico State Fair website, https://statefair.exponm.com/p/participate/competitions/livestock-shows.  The website indicates that

Expo New Mexico is "issuing full refunds of all fees to our exhibitors," and provides a form on its website for individuals who had contracted to attend to make their request for a refund. *Id.* Because Valdez thus is entitled to a refund of the consideration that she paid for her children to participate in the State Fair, the PHO does not undermine her contractual bargain. Further, she and her children will still be able to show their animals, as the New Mexico Youth Livestock Expo is going forward in Roswell, welcoming all entries free of charge and in an unlimited number. *See* New Mexico Youth Livestock Expo Facebook page, https://www.facebook.com/NMJLF1989/photos/pb.181295355267698.2207520000../4601143193282870/?type=3&theater. The fact that they may exhibit their animals in the New Mexico Youth Livestock Expo negates Plaintiffs' claim that the PHO has "fully removed the ability of these children to participate." Doc. 14 at 8.

Even if Plaintiffs were able to show a substantial impairment of a contractual relationship, their claim under the Contracts Clause would fail because, just as it meets the rational basis test, the PHO is drawn in an appropriate and reasonable way to advance a significant and legitimate public purpose. For these reasons, Plaintiffs are unlikely to succeed on the merits of their claims that the PHO violates the Contracts Clause of Article I, Section 10 of the United States Constitution.

F.      State Constitutional Claims

Plaintiffs allege that, by requiring individuals to be vaccinated "to maintain employment or enjoy the benefits of an existing contract," Defendants are violating Plaintiffs' rights "secured by the New Mexico Constitution," and that such violation "is actionable under the New Mexico Civil Rights Act [("NMCRA")]." Doc. 1 ¶¶ 81, 86. "The eleventh amendment generally bars lawsuits in federal court seeking damages against states as well as against state agencies,

25

departments, and employees acting in their official capacity." *Bishop v. John Doe 1*, 902 F.2d 809, 810 (10th Cir. 1990). Nonetheless, a state "may waive its eleventh amendment immunity and consent to suit against itself, related entities and employees." *Id.* Under the NMCRA, the state of New Mexico has waived sovereign immunity "for itself or any public body within the state for claims brought pursuant to the New Mexico Civil Rights Act." N.M. Stat. Ann. § 41-4A-9. This waiver, however, is limited to actions commenced in "any New Mexico district court." N.M. Stat. Ann. § 41-4A-3. The Tenth Circuit has interpreted analogous language in the New Mexico Tort Claims Act ("NMTCA") to mean that a plaintiff cannot "pursue [a] claim against [a state public body] and its employees acting within the scope of their employment in the federal district court, but rather is relegated to the state district court to seek relief consistent with the limited waiver of immunity under [the NMTCA]." *Bishop*, 902 F.2d at 810.

Here, Defendants invoke eleventh amendment immunity and argue that, because the NMCRA waives immunity only as to actions commenced in New Mexico state court, Plaintiffs may not pursue their New Mexico constitutional claims, brought pursuant to the NMCRA, in this Court. Doc. 13 at 32. In response, Plaintiffs argue that this Court nonetheless has pendent jurisdiction over their NMCRA claims. Doc. 14 at 9-10. This Court has considered and rejected that argument in the analogous context of the NMTCA as "incorrect as a matter of law." *Quarrie v. New Mexico Inst. of Mining & Tech.*, No. 13-cv-349, 2014 WL 11456598, at *2 (D.N.M. Feb. 25, 2014). As the *Quarrie* Court explained, "immunity under the Eleventh Amendment is not abrogated by 28 U.S.C. § 1367, and therefore, § 1367 does not authorize federal district courts to exercise jurisdiction over claims against nonconsenting states." *Id.* (citing *Raygor v. Regents of Univ. of Minnesota*, 534 U.S. 533, 542 (2002) (holding that "§ 1367(a)'s grant of jurisdiction does not extend to claims against nonconsenting state

26

defendants")).  Plaintiffs have pointed to no contrary authority to suggest that Defendants have

lost the right to invoke eleventh amendment immunity solely because this Court otherwise would

have supplemental jurisdiction over their NMCRA claims.

Because Plaintiffs are unable to seek a decision on the merits of their NMCRA claims in

this Court, they necessarily are unlikely to succeed on the merits of those claims.

* * *

Accordingly, Plaintiffs have failed to prove that they are "substantially likely to succeed

on the merits" of any of their claims.  *Free the Nipple,* 916 F.3d at 797.  Because Plaintiffs

"must" satisfy their burden as to each factor of the preliminary injunction test, Plaintiffs' failure

to satisfy their burden as to the likelihood of success factor is alone fatal to their request for

preliminary injunctive relief.  *Peterson*, 492 F. Supp. 3d at 1192.  Nonetheless, the Court will

consider the remaining factors of the preliminary injunction test.

## II.  Irreparable Harm

Plaintiffs argue that, because the PHO "burden[s] if not outright den[ies]" their due

process and equal protection rights, the irreparable harm standard is met.  Doc. 1 at 23.  But "[a]s

explained in the preceding sections, [Plaintiffs have] failed to demonstrate the requisite

likelihood of success" on their constitutional claims and, "[a]s a result, [they are] not entitled to a

presumption of irreparable injury."  *Schrier*, 427 F.3d at 1266.

Accordingly, to satisfy the irreparable harm prong of the preliminary injunction test,

Plaintiffs must show that they stand to suffer "an injury" that is "certain, great, actual, and not

theoretical."  *Id.* at 1267 (citation omitted).  "Merely serious or substantial harm is not irreparable

harm."  *Id.* (citation omitted).  Further, "the party seeking injunctive relief must show that the

injury complained of is of such imminence that there is a clear and present need for equitable

relief to prevent irreparable harm." *Id.* (citation omitted).  Importantly, "[i]t is [] well settled that simple economic loss usually does not, in and of itself, constitute irreparable harm; such losses are compensable by monetary damages." *Id.* (citation omitted).  Similarly, "[a] permanent loss of employment, standing alone, does not equate to irreparable harm." *E. St. Louis Laborers' Loc. 100 v. Bellon Wrecking & Salvage Co.*, 414 F.3d 700, 704 (7th Cir. 2005).

Plaintiffs claim that "[t]here is no adequate legal remedy for [their] intangible harms," namely, "being terminated from their employment and from engaging in their chosen profession." Doc. 1 at 23.  But, as discussed above, any harm to Blackford caused by her potential termination and/or inability to continue to work as a nurse is a function not of the PHO but rather of her employer's own vaccine mandate.  And indeed, even if that harm were attributable to the PHO, being so terminated/prevented from working as a nurse does not equate to irreparable harm.  Similarly, Valdez cannot establish any harm from the PHO, because, as discussed above, Expo New Mexico has offered to refund all fees paid to participate in the New Mexico State Fair Junior Livestock Shows and Sale, and Valdez and her children may enter, at no cost, the New Mexico Youth Livestock Expo.  Further, Plaintiffs have failed to establish that any loss to Valdez resulting from the PHO is not compensable by monetary damages.

Plaintiffs thus have failed to establish that they will suffer irreparable harm if the PHO is not enjoined.

III.    Balance of Harms

Plaintiffs contend that "the balance of harms tips decidedly in favor of Plaintiff[s]," because, if an injunction is granted, "Defendants will suffer [only] speculative harm," but if an injunction is not granted, Plaintiffs will suffer "an injury to [their] [constitutional] rights." Doc. 1 at 24.  As the Court has already explained, Plaintiffs are unlikely to succeed on the merits of

their constitutional claims.  Accordingly, the threatened harm that Plaintiffs seek to prevent does not reach a constitutional magnitude.  Nor can the Court agree that any harm to Defendants can be so easily minimized as "speculative."  To the contrary, the Court finds that "the balance of equities tips in Defendants' favor given the strong public interest here they are promoting – preventing further spread of COVID-19 [], a virus [that] has infected and taken the lives of thousands of [New Mexico] residents." *Harris,* 2021 WL 3848012, at *8.  "Plaintiffs' requested relief here would weaken the efforts of [Defendants] to carry out those goals." *Id.*  "Similarly, given the public health efforts promoted by the [PHO], enjoining the continuation of same is not in the public interest." *Id.*

The Court thus finds that Plaintiffs have failed to establish that the balance of harms weighs in their favor or that granting the requested injunction would not be adverse to the public interest. *See ETP Rio Rancho Park*, 2021 WL 765364, at *57 (holding that "the threatened injuries – financial injuries and possible permanent business closure – do not outweigh possible damage – increased COVID-19 spread leading to sickness, hospitalizations, and death – to the Defendants," and "for similar reasons," the requested injunction "would be adverse to the public interest").

## CONCLUSION

To obtain preliminary injunctive relief, Plaintiffs are required to prove that they are substantially likely to succeed on the merits of their claims, that they will suffer irreparable injury if the Court denies the requested injunction, that the balance of harms weighs in their favor, and that the injunction would not be adverse to the public interest.  As set forth above, Plaintiffs fail to satisfy their burden as to any, let alone all, of these factors.  Accordingly, Plaintiffs are not entitled to an order enjoining the PHO.

IT IS THEREFORE ORDERED that Plaintiffs' requests for a temporary restraining order and a preliminary injunction, as set forth in Plaintiffs' Verified Class Action Complaint for Civil Rights Violations Under 42 U.S.C.A. § 1983; Violations of Rights Protected by the New Mexico Civil Rights Act; Emergency Request for a Temporary Restraining Order; Request for Preliminary Injunction, Permanent Injunctive Relief and Damages [Doc. 1], are **DENIED**.

DATED this 13th day of September 2021.

MARTHA VÁZQUEZ
United States District Judge

Attorneys for Plaintiffs
Jared Robert Vander Dussen
A. Blair Dunn
Western Agriculture, Resource and Business Advocates, LLP

Attorneys for Defendants
Holly Agajanian
Kyle P Duffy
Maria S. Dudley
Office of the Governor Michelle Lujan Grisham