## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**TALISHA VALDEZ, on behalf of herself**
**and others similarly situated, and**
**JENNIFER BLACKFORD on behalf of herself**
**And others similarly situated,**

      **Plaintiffs,**

                            **Civil Action. 1:21-cv-00783-MV-JHR**

**v.**

**MICHELLE LUJAN GRISHAM,**
**Officially and Individually, Acting Under the Color of Law,**
**and**
**DAVID SCRASE,**
**Officially and Individually, Acting Under the Color of Law,**

      **Defendants.**

### RESPONSE TO DEFENDANTS' MOTION TO DISMISS

COMES NOW, Plaintiffs Talisha Valdez and Jennifer Blackford, by and through undersigned counsel of record Western Agriculture, Resource and Business Advocates, LLP (A. Blair Dunn, Esq. and Jared R. Vander Dussen, Esq.) and provides their response to Defendants' Motion to Dismiss.

### INTRODUCTION

Though Defendants are heavily inclined to quote *Jacobsen* for the proposition that it offers them a blank check; they do not want to acknowledge the limits of *Jacobsen*, and the current United States Supreme Court's rulings applying *Jacobsen* to the modern problem of COVID. Putting aside the factual reality inconvenient to the Defendants' argument, that in *Jacobsen*, Mr. Jacobsen, who declined to receive the smallpox vaccine, was afforded the option to pay a $5 fine ($140 in today's dollars). The *Jacobsen* Court clearly enunciated there was a limit to how much the government could trample civil rights during a pandemic, stating in its holding that:

Before closing this opinion we deem it appropriate, in order to prevent misapprehension as to our views, to observe—perhaps to repeat a thought already sufficiently expressed, namely—that the police power of a state, whether exercised directly by the legislature, or by a local body acting under its authority, may be exerted in such circumstances, or by regulations so arbitrary and oppressive in particular cases, as to justify the interference of the courts to prevent wrong and oppression. Extreme cases can be readily suggested. Ordinarily such cases are not safe guides in the administration of the law. It is easy, for instance, to suppose the case of an adult who is embraced by the mere words of the act, but yet to subject whom to vaccination in a particular condition of his health *39 or body would be cruel and inhuman in the last degree. We are not to be understood as holding that the statute was intended to be applied to such a case, or, if it was so intended, that the judiciary would not be competent to interfere and protect the health and life of the individual concerned. 'All laws,' this court has said, 'should receive a sensible construction. General terms should be so limited in their application as not to lead to injustice, oppression, or an absurd consequence. It will always, therefore, be presumed that the legislature intended exceptions to its language which would avoid results of this character. The reason of the law in such cases should prevail over its letter.' *United States* v. *Kirby*, 7 Wall. 482, 19 L. ed. 278; *Lau Ow Bew* v. *United States*, 144 U. S. 47, 58, 36 L. ed. 340, 344, 12 Sup. Ct. Rep. 517.

*Jacobson v. Commonwealth of Massachusetts*, 197 U.S. 11, 38–39, 25 S. Ct. 358, 366, 49 L. Ed. 643 (1905).

Moreover, Justice Gorsuch writing in concurrence with the current United States Supreme Court has articulated that even during pandemic public health orders that are not narrowly tailored fail strict scrutiny when they impair fundamental liberties and are therefore unconstitutional, stating:

Put differently, *Jacobson* didn't seek to depart from normal legal rules during a pandemic, and it supplies no precedent for doing so. Instead, *Jacobson* applied what would become the traditional legal test associated with the right at issue—exactly what the Court does today. Here, that means strict scrutiny: The First Amendment traditionally requires a State to treat religious exercises at least as well as comparable secular activities unless it can meet the demands of strict scrutiny— showing it has employed the most narrowly tailored means available to satisfy a compelling state interest. *Church of Lukumi*, 508 U.S. at 546, 113 S.Ct. 2217.

*Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 70, 208 L. Ed. 2d 206 (2020).

And that is not a one-off decision, like *Jacobsen* before modern day constitutional review,

jurisprudence was in place, and since that decision Justice Gorsuch, joined by Justices Alito and

Thomas in another case has reiterated that point, stating:

> In cases implicating this form of "strict scrutiny," courts nearly always face an individual's claim of constitutional right pitted against the government's claim of special expertise in a matter of high importance involving public health or safety. It has never been enough for the State to insist on deference or demand that individual rights give way to collective interests. Of course we are not scientists, but neither may we abandon the field when government officials with experts in tow seek to infringe a constitutionally protected liberty. The whole point of strict scrutiny is to test the government's assertions, and our precedents make plain that it has always been a demanding and rarely satisfied standard. See *Lukumi*, 508 U.S. at 546, 113 S.Ct. 2217. Even in times of crisis—perhaps *especially* in times of crisis—we have a duty to hold governments to the Constitution.

*S. Bay United Pentecostal Church v. Newsom*, 141 S. Ct. 716, 718, 209 L. Ed. 2d 22 (2021)

Thus, the United States Supreme Court's jurisprudence, both the case cited by Defendants

and the cases avoided by Defendants, requires that this Court reach the conclusion that the

complaint should <u>not</u> be dismissed.

## ARGUMENT

Defendants do not, because they cannot, explain how the Public Health Order (PHO)

outlawing nurses from working as nurses in New Mexico does not implicate the long recognized

fundamental liberty to engage in one's chosen profession as protected by the Fourteenth

Amendment.

Here, Plaintiff Blackford has plausibly alleged and verified that she has protected

property interest to engage in her chosen profession and that if the government's PHO

mandate is enforced, she is prohibited from working as nurse in New Mexico as long as the

order is in effect and she is unvaccinated.  It is important to note that her employer has

implemented a policy in order to comply with the PHO mandate that has now resulted in her

being placed on leave without pay at least for the next 4 months but had not done so prior to

the issuance of the PHO.

Plaintiff Blackford has identified a liberty interest warranting due process of law, Defendants disagree because otherwise their actions most certainly would run afoul of the Due Process Clause's protections by depriving Plaintiff of their ability to earn a livelihood in the occupation of their choosing.[1] For example, the United States Supreme Court in *Barry v. Barchi* has opined as to the constitutionally protected property interest in engaging in one's chosen profession of horse racing, stating "Plaintiffs have a liberty interest in pursuing their profession of horse racing and are entitled to due process of law if they are to be lawfully denied an opportunity to do so." *Barry v. Barchi,* 443 U.S. 55, 64, 99 S.Ct. 2642, 61 L.Ed.2d 365 (1979).

Thus, the right of citizens to support themselves by engaging in a chosen occupation is deeply rooted in our nation's legal and cultural history and has long been recognized as a component of the liberties protected by the Fourteenth Amendment. Over a century ago, the Supreme Court recognized that "[i]t requires no argument to show that the right to work for a living in the common occupations of the community is of the very essence of the personal freedom and opportunity that it was the purpose of the [Fourteenth] Amendment to secure." *Truax v. Raich*, 239 U.S. 33, 41, 36 S.Ct. 7, 60 L.Ed. 131 (1915) (holding that a state anti-alien labor statute violated both equal protection and due process). Later, in striking down a law banning the teaching of foreign languages in school, the Supreme Court observed that the Fourteenth

---

[1] "The right to work, I had assumed, was the most precious liberty that man possesses. Man has indeed as much right to work as he has to live, to be free, to own property. The American ideal was stated by Emerson · in his essay on Politics, 'A man has a right to be employed, to be trusted, to be loved, to be revered.' It does many men little good to stay alive and free and propertied, if they cannot work. To work means to eat. It also means to live. For many it would be better to work in jail, than to sit idle on the curb. The great values of freedom are in the opportunities afforded man to press to new horizons, to pit his strength against the forces of nature, to match skills with his fellow man." *Barsky v. Board of Regents of University of State of New York,* 347 U.S. 442, 472 (1954) (Douglas, J, dissenting).

Amendment guaranteed the right, *inter alia*, "to engage in any of the common occupations of life ...." *Meyer v. Nebraska*, 262 U.S. 390, 399, 43 S.Ct. 625, 67 L.Ed. 1042 (1923). Despite later jurisprudence following the *Lochner* era, *Lochner v. New York*, 198 U.S. 45, 25 S.Ct. 539, 49 L.Ed. 937 (1905), de-emphasizing economic substantive due process, our Supreme Court has never repudiated the recognition that a citizen has the right to work for a living and pursue his or her chosen occupation.

The Third Circuit has recognized "[t]he right to hold specific private employment and to follow a chosen profession free from unreasonable governmental interference comes within both the 'liberty' and the 'property' concepts of the Fifth and Fourteenth Amendments." *Piecknick v. Comm. of Pa.*, 36 F.3d 1250, 1259 (3d. Cir. 1994) (citing *Greene v. McElroy*, 360 U.S. 474, 492, 79 S.Ct. 1400, 3 L.Ed.2d 1377 (1959); *Truax*, 239 U.S. at 41, 36 S.Ct. 7). However,

> [t]he Constitution only protects this liberty from state actions that threaten to deprive persons of the right to pursue their chosen occupation. State actions that exclude a person from one particular job are not actionable in suits ... brought directly under the due process clause. It is the liberty to pursue a calling or occupation, and not the right to a specific job, that is secured by the Fourteenth Amendment.

*Id.* (internal citations and quotation marks omitted). Thus, Defendants here are flat wrong, Plaintiff Blackford and the many others similarly situated most certainly have a right to engage in their chosen professions of nursing, other healthcare employees, congregate caregivers or detention officers. There is no question, then, that the Fourteenth Amendment recognizes a liberty interest in citizens—the Plaintiffs here—to pursue their chosen occupation. The dispositive question is not whether such a right exists, but rather, the level of infringement upon the right that may be tolerated.

It is supremely troubling that these Defendants do not recognize the fundamental liberty interest of the individual to decide what should be injected into their person, otherwise recognized

as the common law right to bodily integrity. The Supreme Court has recognized that "no right is held more sacred, or is more carefully guarded by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law." *Union Pac. R. Co. v. Botsford*, 141 U.S. 250, 251, 11 S. Ct. 1000, 1001, 35 L. Ed. 734 (1891). Moreover, the Supreme Court has clearly held that "[T]he forcible injection of medication into a nonconsenting person's body represents a substantial interference with that person's liberty. *Washington v. Harper*, 494 U.S. 210, 229, 110 S. Ct. 1028, 1041, 108 L. Ed. 2d 178 (1990).

In *Harper*, the Court was not dealing with a free person, but rather an incarcerated person, and as of yet citizens of New Mexico should not be treated as prisoners. Justice Stevens dissented in *Harper*, arguing that the majority had "virtually ignore[d] the several dimensions" of the liberty interest it recognized. *Id.* at 237. He noted that a forced administration of medication is especially troubling if it "creates a substantial risk of permanent injury and premature death." *Id.* He also recognized that such intrusions are "degrading" when performed against the will of a competent person. *Id.*

In *Riggins v. Nevada*, 504 U.S. 127 (1992), the Court applied the test from *Harper*, finding that the state did not meet its burden to establish both the need for the drug and its medical appropriateness for the Defendant specifically finding that the state was obligated to show that the medication was the least intrusive means of achieving an "essential" state purpose. *Id.* at 138. In *Cruzan v. Director, Missouri Department of Health,* 497 U.S. 261 (1990), the Court unequivocally acknowledged that "[t]he principle that a competent person has a constitutionally protected liberty interest in refusing unwanted medical treatment may be inferred from our prior decisions." *Id.* at 278.

Nor can defendants explain how punishing children whose parents have made a decision not to vaccinate their children withstands scrutiny that the PHO does not violate the long recognized fundamental liberty to rear children. Just like the concept that Americans enjoy a fundamental liberty to decide what is injected into their bodies, parents hold a fundamental liberty interest in determining what medications are injected into their children. The Supreme Court in numerous decisions concerning the right to marry recognized this as:

> A third basis for protecting the right to marry is that it safeguards children and families and thus draws meaning from related rights of childrearing, procreation, and education. See *Pierce v. Society of Sisters,* 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925); *668 Meyer,* 262 U.S., at 399, 43 S.Ct. 625. The Court has recognized these connections by describing the varied rights as a unified whole: "[T]he right to 'marry, establish a home and bring up children' is a central part of the liberty protected by the Due Process Clause." *Zablocki,* 434 U.S., at 384, 98 S.Ct. 673 (quoting *Meyer, supra,* at 399, 43 S.Ct. 625).

*Obergefell v. Hodges*, 576 U.S. 644, 667–68, 135 S. Ct. 2584, 2600, 192 L. Ed. 2d 609 (2015).

I.  **The Failure to Recognize Clearly Articulated Fundamental Liberty Interests is Fatal to the Motion.**

Defendants make no effort to explain or to provide any analysts to this Court as to why they can satisfy strict scrutiny that the PHO is narrowly tailored to meet their compelling or essential purpose. As demonstrated above, this Court does not even need to perform a *Washington v. Glucksberg*, 521 U.S. 702, analysis to the alleged liberty interests because they have already been recognized as fundamental by the United States Supreme Court. There is no real debate that right to engage in ones chose profession (*Barchi*) or the right to rear children (*Obergefell*) are not fundamental rights recognized previously by the Supreme Court. Moreover, to argue that the most sacred right as recognized as such by the Supreme Court to bodily integrity is not fundamental is tragically laughable; but more importantly means that it is at least quasi-fundamental, not subject to a rational basis test. Importantly, even if bodily integrity is not a "fundamental" right, it is at

least a "quasi" fundamental right subject to intermediate scrutiny. It is well settled that, under

*Plyler v. Doe,* "infringements on certain 'quasi-fundamental' rights, *like bodily integrity*, also

mandate a heightened level of scrutiny." *United States v. Harding*, 971 F.2d 410, 412 n.1 (9th Cir.

1992) (emphasis added).

Thus, because Defendants' motion wholly fails to address whether or not the PHO can

withstand either strict or intermediate scrutiny and relies solely on a rational basis test argument,

it must fail.

## II.   The Defendants Power from the State to Impair Contracts for Public Welfare is Limited.

As is typical for Defendants, they find a blank check with unlimited power everywhere in

the law and in every jurisprudence under the umbrella of public health during the COVID

pandemic. This quite simply is not the case, as with *Jacobsen*, when it come to impairment of

contracts, the Supreme Court has set limits stating that "[T]he states' inherent power to protect the

public welfare may be validly exercised under the Contract Clause even if it impairs a contractual

obligation so long as it does not destroy it." *U.S. Tr. Co. of New York v. New Jersey*, 431 U.S. 1,

26, 97 S. Ct. 1505, 1520, 52 L. Ed. 2d 92 (1977); *citing* 134 N.J.Super., at 190, 338 A.2d, at 870-

871. Here the Defendants' PHO unequivocally destroys both contracts. It destroys the employment

contract of Plaintiff Blackford by requiring her employer terminate her or prevent her from work

to remain compliant with the PHO and it destroyed the contract of every unvaccinated child to

exhibit livestock at the State Fair by making performance impossible by prohibiting their entry

onto the Fair grounds. It is worth noting that when Congress does this, they are still required to

pay damages to any harmed party under the Fifth Amendment.

Here, because the destruction of the contracts is fully realized, this Court must examine the

limit of state's actions to impair a contract as to the reasonableness of the conditions and of a

character appropriate to the public purpose as the Supreme Court has warned "private contracts are not subject to unlimited modification under the police power." *U.S. Tr. Co. of New York*, 431 U.S. at 22.  Thus, Court must evaluate that limit, "[a]ssuming that this stated interest is a 'broad and general social or economic problem,' and therefore, a legitimate public purpose, the Court must then address the reasonableness and necessity of the regulation. *Universal Ins. Co. v. Dep't of Justice*, 866 F. Supp. 2d 49, 69 (D.P.R. 2012), *on reconsideration in part* (June 22, 2012).  Essentially, a review as to reasonableness of this a particular measure, this Court must therefore conduct some review of the tailoring of the PHO's actions.

First, with regard to cancelling the contracts of the State Fair Exhibitors, no argument can be made that it was in any way tailored to address specifics of the youth livestock exhibitors.  Youth exhibitors are in large outdoor or indoor barn arenas which social distancing and masking are easily accomplished.  Moreover, the PHO targeted the state fair while allowing the Pride Fest an event with thousands of people to attend without the requirement for vaccination on the Fairground after the issuance of the PHO but before the State Fair occurred.[2] As to the destruction of the employment contracts of healthcare workers like Plaintiff Blackford (despite the disingenuous and unsubstantiated argument that the employers would have imposed that condition on those contracts regardless of the requirement of the PHO that they do so), Plaintiff has provided examples to this Court of the well understood fact that the vaccinated are as susceptible to contracting the disease and spreading the disease as the unvaccinated.  There is no documentation that unvaccinated workers in the affected industries were being infected at any greater rate or severity than the vaccinated workers, that they were responsible for a greater rate of spread, that masking and other physical measures were not working, or that other treatments were not available

---

[2] https://www.krqe.com/video/proof-vaccination-not-required-for-pride-fest/6912073/

short injection of gene modification therapies that work to treat Covid and slow its spread. *See* Exhibits 5, 7 and 8.  It is simply not a reasonable condition to place the workers who by all accounts serve as no greater threat for spread of the disease to terminate them from their chosen professions and given the character of the government actions should still be evaluated under strict scrutiny for reasonableness and necessity.

>          III.    **The Motion Fails Regarding Dismissal of the State Law Claims as Well.**

Because the majority of the thrust of argument rests on the erroneous assertion that the constitutional claims are evaluated on a rational basis review, so does this part of the argument in the Motion fail as well.  But, beyond arguments regarding Eleventh Amendment immunity must gain no purchase with this Court, Plaintiffs are not asking this Court to broadly construe the language of the New Mexico Civil Rights Act regarding waiver of sovereign immunity for claims brought in federal court. Plaintiffs are merely asking that this Court construe nearly identical language, identically to the way it has been construed for decades.  The New Mexico Tort Claims act states:

> Exclusive original jurisdiction for any claim under the Tort Claims Act shall be in the district courts of New Mexico. Appeals may be taken as provided by law.

NMSA 1978 § 41-4-18. Whereas, the language of the New Mexico Civil Rights Act states:

> A person who claims to have suffered a deprivation of any rights, privileges or immunities pursuant to the bill of rights of the constitution of New Mexico due to acts or omissions of a public body or person acting on behalf of, under color of or within the course and scope of the authority of a public body may maintain an action to establish liability and recover actual damages and equitable or injunctive relief in any New Mexico district court.

NMSA 1978 § 41-4A-3.  Moreover, the waiver of sovereign immunity actually codified in the New Mexico Civil Rights Act says nothing about limiting that waiver only to state district courts stating:

> The state shall not have sovereign immunity for itself or any public body within the state for claims brought pursuant to the New Mexico Civil Rights Act, and the public body or person acting on behalf of, under color of or within the course and scope of the authority of the public body provided pursuant to the New Mexico Civil Rights Act shall not assert sovereign immunity as a defense or bar to an action.

NMSA 1978 § 41-4A-9.

Defendants cannot reasonably ask this Court to interpret nearly identical language in a new statute in a way that is wholly inconsistent with decades of interpretation from this District and even this Court.

**IV.    There is Clear Supreme Court Precedent for All Three Constitutional Claims Raised that Precludes Qualified Immunity.**

Defendants supply this Court with no analysis or jurisprudence to support that qualified immunity should be appropriate in this instance.  Whereas Plaintiff has supplied this Court with Supreme Court jurisprudence that clearly establishes a claim of deprivation of a property interest in a chosen profession (*Barchi*), a claim for denial of bodily integrity (*Cruzan*) and a claim for violation a parental rights *(Obergefell)*.

**CONCLUSION**

Because Defendants' Motion suffers from a variety of fatal flaws, this Court should deny the Motion.

Respectfully submitted this 13th day of September 2021.

> WESTERN AGRICULTURE, RESOURCE
> AND BUSINESS ADVOCATES, LLP
>
> */s/ A. Blair Dunn*
> A. Blair Dunn, Esq.
> Jared R. Vander Dussen, Esq.
> 400 Gold Ave SW, Suite 1000
> Albuquerque, NM 87102
> (505) 750-3060
> abdunn@ablairdunn-esq.com
> warba.llp.jared@gmail.com

## CERTIFICATE OF SERVICE

I hereby certify that on September 13, 2021, I filed the foregoing via the CM/ECF filing

system and caused a copy to be served upon counsel for Defendants via email.

*/s/ A. Blair Dunn*
A. Blair Dunn, Esq.