## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

TALISHA VALDEZ, on behalf of herself
and others similarly situated, and
JENNIFER BLACKFORD, on behalf of herself
and others similarly situated,

        Plaintiffs,

                                      Case No. 21-cv-783 MV/JHR

    vs.

MICHELLE LUJAN GRISHAM,
Officially and Individually, Acting Under the Color of Law,
and
DAVID SCRASE,
Officially and Individually, Acting Under the Color of Law,

        Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on Motion to Dismiss Plaintiffs' Verified Complaint [Doc. 17]. The Court, having considered the Motions and the relevant law, finds that the Motion is well-taken and will be granted.

## BACKGROUND

Since its emergence last year, the novel coronavirus 2019, or Sars-CoV-2, the virus that causes COVID-19, has spread exponentially through the world, and New Mexico has been no exception. Doc. 17 at 3. Governor Michelle Lujan Grisham first declared the existence of a Public Health Emergency in New Mexico in March 2020, when COVID-19 reached our State, and has since renewed that declaration. *See* July 15, 2022 Public Health Order ("July 2022 PHO"), https://cv.nmhealth.org/public-health-orders-and-executive-orders/ (hereinafter referred to as "NM Health Website"). As of July 15, 2022, over 88.7 million people have been infected

with COVID-19 in the United States, with over 1,017,000 related deaths, and the New Mexico Department of Health ("DOH") has reported over 575,000 positive COVID-19 cases and 8,000 related deaths in New Mexico.  *See* July 2022 PHO.

Efforts to develop and distribute a vaccine against COVID-19 were swift.  In February 2020, the United States Department of Health and Human Services ("HHS") declared a public emergency and instructed the United States Food and Drug Administration ("FDA") to grant emergency use authorizations ("EUA") for "medical devices and interventions" to combat the pandemic, including vaccines.  Doc. 17 at 5.  The FDA issued detailed guidance to vaccine manufacturers, requiring a determination that the vaccine's benefits outweigh its risks based on data from at least one well-designed Phase 3 clinical trial that demonstrates the vaccine's safety and efficacy in a clear and compelling manner.  *Id.* at 6.

Three vaccine candidates emerged as frontrunners:  Pfizer/BioNTech ("Pfizer") and Moderna's two-dose mRNA vaccines, and Johnson & Johnson's ("J&J") single-dose viral vector vaccine.  *Id.*  By the time Pfizer, Moderna, and J&J applied for EUA status (which, for Pfizer and Moderna, was in November 2020, and for J&J, was in February 2021), each vaccine had undergone significant testing.  *Id.* at 6-7.  After a team of representatives from across the FDA reviewed the data submitted by each manufacturer and independently assessed the risks and benefits of the vaccines, the FDA granted EUAs, for individuals 16 and older, to Pfizer and Moderna's vaccines in December 2020 and to J&J's vaccine in February 2021, noting that each had met the expectations set out in the FDA's comprehensive guidance.  *Id.* at 7.  Pfizer's vaccine later received EUA for individuals 12 and older, and on August 23, 2021, received full FDA approval for individuals 16 and older.  *Id.*  As of July 2022, the FDA has extended the EUAs granted to the Moderna and Pfizer vaccines to include children down to six months of age,

has authorized booster shots for individuals 5 years and older, has authorized second booster

shots for older people and certain immunocompromised individuals, and has granted full

approval to the Pfizer vaccine for individuals 12 years of age and older.  *See* FDA News

Releases, https://www.fda.gov/news-events/.

Since the three vaccines originally received EUA status, over 601 million doses have

been administered and over 20.2 million Americans have been fully vaccinated.  *COVID-19*

*Vaccinations in the United States,* CDC, https://covid.cdc.gov/covid-data-

tracker/#vaccinations_vacc-people-additional-dose-totalpop.  Comprehensive data collected

since the three vaccines received EUA status demonstrates that they are safe and highly effective

in preventing infection and severe illness, and that serious adverse side effects from the vaccines

are exceedingly rare.  Doc. 17 at 8-9.  Further, the immunity provided by the vaccines is

significantly more robust than natural immunity gained following infection.  *Id.*

With the first EUAs for covid vaccines, "New Mexico put into motion one of the most

efficient vaccine rollouts in the United States."  Simon Romero, *How New Mexico Became the*

*State with the Highest Rate of Full Vaccinations*, The New York Times (Apr. 14, 2021),

https://www.nytimes.com/2021/04/14/us/new-mexico-covid-vaccines.html.  "Going into the

pandemic with a dearth of financial resources compared with richer states, and vulnerabilities

like having fewer hospital beds per capita than nearly every other state, the authorities in New

Mexico saw the vaccine as their most powerful weapon to stave off an even more harrowing

crisis."  *Id.*  By April 2021, New Mexico had reached the second highest vaccination rate in the

United States.  *Id.*

As the number of vaccinated New Mexicans grew and scientific studies showed that the

vaccines were safe and effective in preventing severe illness, Governor Lujan Grisham and the

DOH began to lift restrictions on businesses and travel into the state, and to shift pandemic

mitigation strategies toward vaccine and mask mandates.  Quickly following the reopening of

New Mexico, however, the "highly transmissible" Delta variant emerged, soon accounted for

virtually all new infections, and caused a "significant increase in new COVID-19 cases."  Doc.

1-2.  While the Delta variant was found to be more likely to cause "breakthrough" infections

than other variants, the vaccines still provided strong protection against serious illness and death

in individuals who contracted the Delta variant.  Doc. 17 at 9.

To stem the tide of new cases and ease the pressure on our hospitals, on August 17, 2021,

New Mexico Department of Health Acting Secretary David R. Scrase, M.D., issued "Public

Health Emergency Order Requiring All School Workers Comply with Certain Health

Requirements and Requiring Congregate Care Facility Workers, Hospital Workers, and

Employees of the Office of the Governor Be Fully Vaccinated" (the "August 2021 PHO").  Doc.

1-2.  In relevant part, the August 2021 PHO requires all "hospital workers . . . to be fully

vaccinated against COVID-19 unless they qualify for an exemption."  *Id.* at 3-4.  The August

2021 PHO also requires that "[a]ll persons who are eligible to receive a COVID-19 vaccine and

enter the grounds of the New Mexico State Fair . . . provide adequate proof of being fully

vaccinated against COVID-19 . . . unless the individual qualifies for an exemption."  *Id.* at 5.

Both hospital workers and individuals who seek entry into the State Fair "may be exempt from

the COVID-19 vaccination requirement . . . if they have a qualifying medical condition which

immunization would endanger their health, or they are entitled . . . to a disability-related

reasonable accommodation or a sincerely held religious belief accommodation."  *Id.* at 4, 5-6.  A

religious belief exemption may be supported by "a statement regarding the manner in which the

administration of a COVID-19 vaccine conflicts with the religious observance, practice, or belief

of the individual." *Id.* at 4-5, 6.  The August 2021 PHO specifically indicates that the vaccine requirements set forth therein are based on the following scientific and medical evidence:  "the currently available COVID-19 vaccines are safe and the most effective way of preventing infection, serious illness, and death"; "widespread vaccination protects New Mexico's health care system as vaccines decrease the need for emergency services and hospitalization"; and "the refusal to receive the COVID-19 vaccine not only endangers the individual but the entire community, and further jeopardizes the progress the State has made against the pandemic by allowing the virus to transmit more freely and mutate into more transmissible or deadly variants." *Id.*

While New Mexico was still experiencing a "significant increase in new COVID-19 cases" as a result of the Delta variant, the CDC identified yet another new variant of concern, "Omicron."  NMDOH Press Release (Dec. 13, 2021), https://cv.nmhealth.org/2021/12/13/state-identifies-first-omicron-covid-19-case/.  On December 13, 2021, the DOH announced its first identified case of the Omicron variant in New Mexico.  *Id.*  With the prevalence of the Omicron variants, the CDC advises that "COVID-19 vaccines remain the best public health measure to protect people from COVID-19 and reduce the likelihood of new variants emerging."  *What You Need to Know*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/variants/omicron-variant.html?s_cid=11734:omicron%20vaccine%20efficacy:sem.ga:p:RG:GM:gen:PTN:FY22.  Further, the CDC indicates that "[c]urrent vaccines protect against severe illness, hospitalizations, and deaths due to infection with the Omicron variant," and that "[p]eople who are up to date with their COVID-19 vaccines and get COVID-19 are less likely to develop serious illness than those who are unvaccinated and get COVID-19."  *Id.*  In the face of the newly discovered Omicron variant, Governor Lujan Grisham and the DOH issued a public health

order mandating that certain individuals, again including health care and congregate care workers, receive booster vaccines. *See* December 2, 2021 Public Health Order, NM Health Website.

On August 19, 2021, Plaintiffs commenced the instant action by filing their Verified Class Action Complaint for Civil Rights Violations under 42 U.S.C. Section 1983; Violations of Rights Protected by the New Mexico Civil Rights Act; Emergency Request for a Temporary Restraining Order; Request for Preliminary Injunction, Permanent Injunctive Relief and Damages. Doc. 1. Named Plaintiff Jennifer Blackford is a registered nurse employed by Presbyterian. Doc. 1-3 ¶ 2. She asserts that the August 2021 PHO "requires that [she] be terminated if [she] refuse[s] to be vaccinated for COVID-19," and that, based on her "medical training and her own independent research," she is "opposed to receiving the EUA covid vaccines." *Id.* ¶¶ 4-5. Named Plaintiff Talisha Valdez, on behalf of herself and her 11- and 12-year-old daughters, had contracted to exhibit their animals at the New Mexico State Fair. Doc. 1-4 ¶¶ 2, 6. She asserts that the August 2021 PHO "prohibits [her] and [her] children from attending the New Mexico State Fair and showing their animals," and that she has chosen "not to be vaccinated" and "to refuse to have [her] child injected with an experimental EUA vaccine." *Id.* at ¶¶ 9, 12. Together, Plaintiffs claim that the August 2021 PHO's vaccine requirements violate the Federal Food, Drug, and Cosmetic Act ("FDCA"), their federal constitutional rights to equal protection, substantive due process, and procedural due process, their rights under Article 1, Section 10 of the United States Constitution, and their rights under the New Mexico Constitution. Doc. 1 at 9-14. As a result of these alleged violations, Plaintiffs request declaratory relief, "a temporary restraining order to prohibit Defendants from enforcing public health orders against the Plaintiffs and other putative class members that are similarly situated,"

6

a preliminary injunction "to prohibit Defendants from enforcing public health orders in the

arbitrary and capricious manner and fashion engaged by Defendants," and actual and punitive

damages.  *Id.* at 14-15.

In an Order entered on August 23, 2021, the Court denied Plaintiffs' request for entry of

an emergency order on an *ex parte* basis, explaining that Plaintiffs did not meet the requirements

of Rule 65(b)(1) of the Federal Rules of Civil Procedure that would entitle them to a temporary

restraining order "without written or oral notice to the adverse party or its attorney."  Doc. 3.

The Court, however, set an expedited briefing schedule on Plaintiffs' request for preliminary

relief.  *Id.*  Later that day, Plaintiffs filed a motion asking the Court to reconsider its decision.

Doc. 4.  In an Order entered on August 25, 20121, the Court denied Plaintiffs' motion,

explaining that Plaintiffs provided no basis for the Court to use its inherent authority to

reconsider its decision to refrain from issuing an order enjoining enforcement of the August 2021

PHO without providing Defendants with an opportunity to respond.  Doc. 10.

In a Memorandum Opinion and Order entered on September 13, 2021, the Court denied

Plaintiffs' request for a preliminary injunction.  Doc. 18.  The Court explained that, to obtain

preliminary injunctive relief, Plaintiffs were required to prove that they were substantially likely

to succeed on the merits of their claims, that they would suffer irreparable injury if the Court

denied the requested injunction, that the balance of harms weighed in their favor, and that the

injunction would not be adverse to the public interest.  *Id.*  The Court found that Plaintiffs failed

to satisfy their burden as to any, let alone all, of these factors and that, accordingly, they were not

entitled to an order enjoining the August 2021 PHO.  *Id.*

Plaintiffs filed an interlocutory appeal and, in an Order and Judgment entered on June

14, 2022, the Tenth Circuit affirmed the denial of a preliminary injunction.  *Valdez v. Grisham*,

No. 21-2105, 2022 WL 2129071 (June 14, 2022).  The Tenth Circuit found, *inter alia*, that this Court did not abuse its discretion in concluding that Ms. Blackford was not substantially likely to succeed on the merits of her substantive due process and equal protection claims.  *Id.*

On September 2, 2021, Defendants filed their Motion to Dismiss Plaintiffs' Verified Complaint.  Doc. 17.  Plaintiffs filed a response in opposition on September 13, 2021, Doc. 20, and Defendants' reply followed on September 27, 2021.  Doc. 26.  Defendants' Motion to Dismiss is now before the Court.

## STANDARD

Under Rule 12(b)(6), a Court may dismiss a complaint for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  "The nature of a Rule 12(b)(6) motion tests the sufficiency of the allegations within the four corners of the complaint."  *Mobley v. McCormick*, 40 F.3d 337, 340 (10th Cir. 1994).  When considering a Rule 12(b)(6) motion, the Court must accept as true all well-pleaded factual allegations in the complaint, view those allegations in the light most favorable to the non-moving party, and draw all reasonable inferences in the plaintiff's favor.  *Smith v. United States*, 561 F.3d 1090, 1097 (10th Cir. 2009), *cert. denied*, 130 S. Ct. 1142 (2010).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citations omitted).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'"  *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557

(2007)).

The Court in *Iqbal* identified "two working principles" in the context of a motion to dismiss. *Iqbal*, 556 U.S. at 678. First, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* Accordingly, Rule 8 "does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Id.* at 678-79. "Second, only a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* at 679; *see Twombly*, 550 U.S. at 570 (holding that a plaintiff must "nudge" her claims "across the line from conceivable to plausible"). Accordingly, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not shown – that the pleader is entitled to relief." *Iqbal*, 556 U.S. at 679 (citation omitted).

In keeping with these two principles, the Court explained,

> a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief."

*Id.*

## DISCUSSION

In their Motion to Dismiss, Defendants argue that the Complaint should be dismissed in its entirety for failure to state a claim. Defendants additionally argue that, as to Plaintiffs' federal constitutional claims brought pursuant to § 1983, the Defendants, in their individual capacity, are entitled to dismissal based on qualified immunity. As set forth herein, the Court finds that Plaintiffs have failed to state any federal claims and that, as a result, the counts of the Complaint

allegedly arising under federal law must be dismissed with prejudice.  The Court thus need not

reach the issue of qualified immunity.  Further, the Court declines to exercise supplemental

jurisdiction over Plaintiff's state law claims and, accordingly, those claims will be dismissed

without prejudice.

I.      FDCA Claims

        In the Complaint, Plaintiffs allege that, by mandating that certain individuals be

vaccinated against COVID-19, the August 2021 PHO violates the FDCA, because the provisions

of the FDCA relevant to medical products under an EUA "state[] that where a medical product is

'unapproved' then no one may be mandated to take it."  Doc. 1 ¶ 54 (quoting 21 U.S.C. §

360bbb-3(e)).  As an initial matter, the FDA has now given its **full approval** – not just

emergency use authorization – to the Pfizer vaccine as administered to individuals 12 years of

age and older.  Accordingly, the provisions of the FDCA quoted by Plaintiffs, which are

applicable only to medical products under an EUA, are not applicable to the administration of the

Pfizer vaccine to individuals 12 years of age and older.

        Further, while the statutory provisions quoted by Plaintiffs apply to the Moderna vaccine,

the J&J vaccine, and the Pfizer vaccine as administered to individuals under the age of 12, those

provisions nowhere prevent the state, or any other entity, from requiring certain individuals to be

vaccinated against COVID-19.  Rather, in relevant part, the FDCA requires that, for medical

products under an EUA, "HHS must establish conditions to facilitate informed consent."

*Klaassen v. Trustees of Indiana Univ. ("Klaassen I")*, 549 F. Supp. 3d 836, 870) (N.D. Ind.

2021) (citing 21 U.S.C. § 360bbb-3(e)(1)(A)(ii)).  Specifically, "HHS must ensure that

individuals taking the vaccine are informed that the Secretary has authorized the emergency use

of the product," "of the significant known and potential benefits and risks of such use, and of the

10

extent to which such benefits and risks are unknown," and "of the option to accept or refuse

administration of the product, of the consequences, if any, of refusing administration of the

product, and of the alternatives to the product that are available and of their benefits and risks."

*Klaassen I*, 549 F. Supp. 3d at 870 (quoting 21 U.S.C. § 360bbb-3(e)(1)(A)(ii)).  This informed

consent requirement "only applies to medical providers."  *Klaassen I*, 549 F. Supp. 3d at 870.

Here, Defendants are not "directly administering the vaccine" to hospital workers and

individuals who seek entry into the State Fair; instead, they are requiring such individuals "to

obtain the vaccine from a medical provider and to attest that they have been vaccinated, save for

certain exemptions."  *Id.*  The individuals "will be informed of the risks and benefits of the

vaccine and of the option to accept or refuse the vaccine by their medical providers."  *Id.*

Accordingly, to the extent that the vaccines at issue here remain subject to the EUA

provisions of the FDCA, the August 2021 PHO does not run afoul of those provisions.  *Id.; see

also Bridges v. Hous. Methodist Hosp.*, 543 F. Supp. 3d 525, 527 (S.D. Tex. 2021) (rejecting

hospital employee's claim, virtually identical to Plaintiffs' claim here, that under FDCA "no one

can be mandated to receive 'unapproved' medicines in emergencies," noting that the FDCA

"confers certain powers and responsibilities to the Secretary of Health and Human Services in an

emergency," "neither expands nor restricts the responsibilities of private employers," and "does

not confer a private opportunity to sue the government"); Dep't of Justice, *Whether Section 564

of the Food, Drug and Cosmetic Act Prohibits Entities from Requiring the Use of a Vaccine

Subject to an Emergency Use Authorization* at 2 (July 6, 2021),

https://www.justice.gov/olc/file/1415446/download (finding that informed consent provision in

FDCA "specifies only that certain information be provided to potential vaccine recipients and

does not prohibit entities from imposing vaccination requirements").

11

Notably, in their Response to Defendants' Motion to Dismiss, Plaintiffs do not mention, much less refute, Defendants' arguments in support of dismissal of the FDCA claims. Because Plaintiffs appear to have abandoned their FDCA claims, and because those claims are meritless, the Court will dismiss them.

II.   <u>Substantive Due Process Claims</u>

Plaintiffs generally allege that they "have [constitutionally] protected liberty interests" "in their right to live without arbitrary governmental interference under the Fourteenth Amendment," their right "to bodily integrity under the Fourth Amendment," their right "to raise their children as they see fit" under the Fourteenth Amendment, and their right "to engage in their chosen professions" under the Fourteenth Amendment. Doc. 1 ¶ 63. Plaintiffs further allege that, because the August 2021 PHO is "not narrowly tailored," it violates these substantive due process rights. *Id.* ¶ 65.

Here, "plaintiffs advance a substantive due process challenge to a *legislative* enactment," namely, the August 2021 PHO. *Dias v. City & Cty. of Denver*, 567 F.3d 1169, 1182 (10th Cir. 2009) (emphasis in original); *see also ETP Rio Rancho Park, LLC, v. Grisham*, 522 F. Supp. 3d 966, 1029 (D.N.M. 2021) (noting that, "[a]lthough the NMDOH – a state executive agency" – issued the challenged PHO, that PHO was "akin to a legislative action"); *Valdez*, 2022 WL 2129071, at *4 ("The district court did not abuse its discretion by applying the fundamental-right test because the PHO 'attempt[s], through policy, to achieve a stated government purpose,' like a legislative act.") (quoting *Abdi v. Wray*, 942 F.3d 1019, 1028 (10th Cir. 2019)). Accordingly, a "two-part substantive due process framework is applicable." *Dias*, 567 F.3d at 1182; *see also ETP Rio Rancho Park*, 522 F. Supp. 3d at 1029 (applying the two-part approach to trampoline

park owners' substantive due process challenge to PHO that limited operations for recreational facilities).

First, the Court must "carefully describe the asserted fundamental liberty interest." *Dias*, 567 F.3d at 1182 (citation omitted).  Second, the Court must decide "whether that interest is 'deeply rooted in this Nation's history and tradition' and 'implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed.'" *Id.* (quoting *Washington v. Glucksberg,* 521 U.S.  702, 720–21 (1997)).  If the Court determines that the rights asserted are fundamental, the Fourteenth Amendment "forbids the government to infringe [those] rights at all, . . . unless the infringement is narrowly tailored to serve a compelling state interest." *Glucksberg*, 521 U.S. at 721.  If the legislative (or executive) action at issue "does not implicate a fundamental right, it must nonetheless bear a rational relationship to a legitimate government interest." *Dias*, 567 F.3d at 1182 (citation omitted).

Plaintiffs' assertion of broadly defined rights falls short of providing the "careful description of the asserted fundamental liberty interest" required under *Glucksberg* to establish a fundamental right.  *ETP Rio Rancho Park*, 522 F. Supp. 3d at 1031.  Plaintiffs do not explain how the rights allegedly violated by the August 2021 PHO are *fundamental*; indeed, nowhere do they address how the right to work in a hospital or attend the State Fair, unvaccinated and during a pandemic, is "deeply rooted in this Nation's history and tradition." *Id.*

In opposition to Defendants' Motion to Dismiss, Plaintiffs argue that the August 2021 PHO violates "the fundamental liberty interest of the individual to decide what should be injected into their person, otherwise recognized as the common law right to bodily integrity." Doc. 20 at 5-6.[1]  Plaintiffs assert that the Supreme Court has "clearly" and "unequivocally"

---

[1] As noted above, the Complaint alleges that the August 2021 violates Plaintiffs' right to bodily

13

recognized "the principle that a competent person has a constitutionally protected liberty interest in refusing unwanted medical treatment," citing, *inter alia*, to *Cruzan v. Dir., Missouri Dep't of Health*, 497 U.S. 261 (1990).

But the August 2021 PHO "does not force Plaintiffs to consent to vaccination." *Andre-Rodney v. Hochul*, 569 F. Supp. 3d 128, 139 (N.D.N.Y. 2021).  Unlike the plaintiffs in *Cruzan* and its progeny, Plaintiffs here are not "being forcibly injected or forcibly given unwanted medical treatment," or otherwise "facing vaccination against [their] will." *Bauer v. Summey*, 568 F. Supp. 3d 573, 592 n.5 (D.S.C. 2021).  To the contrary, Plaintiffs remain free to choose whether to be vaccinated.

Accordingly, the August 2021 PHO does not "directly infringe[]" on the protected right to refuse medical treatment, and the *Cruzan* line of cases is inapposite.  *Andre-Rodney*, 569 F. Supp. 3d at 139.[2]  Rather, the August 2021 PHO "conditions [Ms. Blackford's] right to be employed at a covered entity on [her] vaccination against COVID-19." *Id.*  As such, "the right that is being burdened is the right to employment at a covered health entity. *Id.*; *see also We the*

---

integrity *under the Fourth Amendment*.  Plaintiffs, however, "raise[] no legal argument to explain how the Fourth Amendment is implicated in the vaccine context. Although a vaccine could be described as the act of injecting a foreign substance into a person's body, Plaintiff must cite legal authority for how that act falls within the Fourth Amendment's scope." *Brass v. Biden*, No. 21-cv-02778, 2021 WL 6498143, at *2 (D. Colo. Dec. 23, 2021), *report and recommendation adopted*, No. 21-cv-02778, 2022 WL 136903 (D. Colo. Jan. 14, 2022).  Plaintiffs does not point to, and the Court has not found, any cases in which vaccine mandates were found to raise any Fourth Amendment concerns.

[2] *Cruzan* is also distinguishable because it was limited "to an individual's choice related to the refusal of lifesaving subsistence. . . – with no ramifications to the physical health of others." Vaccines, in contrast, "address a collective enemy, not just an individual one." *Klaassen I*, 549 F. Supp. 3d at 869; *accord*, *Mass. Corr. Officers Federated Union v. Baker*, 567 F. Supp. 3d 315, 326 n.5 (D. Mass. 2021) ("*Cruzan*'s holding, however, was limited to an individual's choice related to the refusal of lifesaving medical care and nutrition, with no impact on the health of others or the public.").

*Patriots USA, Inc. v. Hochul*, 17 F.4th 226, 294 (2d Cir. 2021) ("Vaccination is a condition of employment in the healthcare field; the State is not forcibly vaccinating healthcare workers."); *Norris v. Stanley*, 567 F. Supp. 3d 818, 821 (W.D. Mich. 2021) ("The MSU vaccination policy does not force Plaintiff to forego her rights to privacy and bodily autonomy, but if she chooses not to be vaccinated, she does not have the right to work at MSU at the same time."); *Bauer*, 568 F. Supp. 3d at 592 ("[A] more appropriate description [of the rights at issue] is plaintiff's interest in continued employment with defendants while unvaccinated for COVID-19."); *Brnovich v. Biden*, 562 F. Supp. 3d 123, 163 (D. Ariz. 2022) ("Properly construed, this case raises only the much narrower question whether there is a substantive due process right to refuse vaccination while an employee of a federal contractor" – a "question easily answered in the negative."); *Beckerich v. St. Elizabeth Med. Ctr.*, 563 F. Supp. 3d 633, 644 (E.D. Ky. 2021) ("Plaintiffs are choosing whether to comply with a condition of employment, or to deal with the potential consequences of that choice.").

In much the same way, Plaintiffs argue that the August 2021 PHO violates "the long recognized fundamental liberty to rear children," as "parents hold a fundamental liberty interest in determining what medications are injected into their children."  Doc. 20 at 7.  This argument fails for much the same reasons, as the August 2021 PHO did not require Ms. Valdez to vaccine her children, but rather conditioned their entry into the State Fair on their vaccination.  *See Doe v. Zucker*, 520 F. Supp. 3d 217, 250–51 (N.D.N.Y. 2021) (finding that regulations requiring vaccination of schoolchildren did not "directly infringe" on the plaintiffs' liberty interest in refusing unwanted medical treatment because they did not "force parents to consent to vaccination of their children"); *Workman v. Mingo Cnty. Bd. of Educ.,* 419 F. App'x 348, 355

15

(4th Cir. 2011) (holding that conditioning attendance at school on vaccination status did not violate a fundamental right).

Thus, at essence, Plaintiffs' opposition to the August 2021 PHO on substantive due process grounds challenges its infringement of (1) Ms. Blackford's asserted right to continue working (unvaccinated) at Presbyterian and (2) Ms. Valdez's asserted right to bring her children (unvaccinated) to the State Fair.  In opposition to Defendants' Motion to Dismiss, Plaintiffs fail to argue, let alone provide any authority for, the latter assertion, and the Court has found none; accordingly, it appears undisputed that the vaccine mandate, as it applies to the State Fair, does not implicate a fundamental right.  As to the former assertion, Plaintiffs contend that Ms. Blackford's right to engage in her "chosen profession is deeply rooted in our nation's legal and cultural history and has long been recognized as a component of the liberties protected by the Fourteenth Amendment."  Doc. 20 at 4.

But the Tenth Circuit "has explicitly held that the 'right to practice in [one's] chosen profession . . . does not invoke heightened scrutiny' if subject to reasonable health and safety regulations."  *Valdez*, 2022 WL 2129071, at *4 (quoting *Guttman v. Khalsa*, 669 F.3d 1101, 1118 (10th Cir. 2012)).   "[A]lthough 'the liberty component of the Fourteenth Amendment's Due Process Clause includes some generalized due process right to choose one's field of private employment,' this right is 'subject to reasonable government regulation.'" *Guttman*, 669 F.3d at 1118 (quoting *Conn v. Gabbert,* 526 U.S. 286, 291-92, (1999)); *see also Collins v. Texas,* 223 U.S. 288 (1912) (the right to practice medicine is not a fundamental right).  While Plaintiffs may have a right to engage in their chosen professions, governmental infringement on this right will be "presumed to be valid" so long as it is "rationally related to a legitimate state interest." *Klaassen I*, 549 F. Supp. 3d at 861 (quoting *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S.

16

432, 440 (1985)).  Under "this binding precedent," Ms. Blackford does "not have a fundamental

right to work unvaccinated in a hospital or congregate care facility." *Valdez*, 2022 WL 2129071,

at *4.

To the extent that Plaintiffs contend that Ms. Blackford has [a] protected property interest

to engage in her chosen profession," Doc. 20 at 3, the law is clear that "property rights . . . are

not fundamental for substantive due process purposes." *ETP Rio Rancho Park*, 522 F. Supp. at

1029-32.  And "[p]roperty interests related to employment" are no exception, as they "are not

among protected fundamental rights." *Maniscalco v. New York City Dep't of Educ.*, 563 F.

Supp. 3d 33, 39 (E.D.N.Y 2021).   "Neither is there a fundamental right to continued public

employment." *Id.* (citing *Martin v. Town of Brattleboro*, No. 07-cv-260, 2008 WL 4416283, at

*2 (D. Vt. Sept. 24, 2008) (noting that "most Circuit Courts of Appeal have declined to find that

a right to continued public employment is a fundamental property interest entitled to substantive

due process protection.")); *see also American Fed'n of Gov't Employees v. United States*, 330

F.3d 513, 523 (D.C. Cir. 2003) (finding that federal employees did not have a fundamental right

to public employment for purposes of substantive due process and stating that "[n]either the

Supreme Court nor [the D.C. Circuit] has ever recognized an interest in public employment as

fundamental").  Indeed, when the government acts in its role as an employer (as Defendants do

here), as opposed to its "role in governing the citizenry at large," the Supreme Court "has applied

what was essentially a rational basis test" to constitutional claims. *Baker*, 567 F. Supp. 3d at

325-26 (citing *Kelley v. Johnson*, 425 U.S. 238, 244-48 (1976)).

Ms. Blackford's reliance on *Barry v. Barchi*, 443 U.S. 55 (1979) for the proposition that

she "has identified a liberty interest warranting due process of law," Doc. 20 at 4, is misplaced.

As the Tenth Circuit explained, in *Barry*, the issue before the Supreme Court was "whether a

17

regulation governing the licensure of horse trainers violated procedural due process and the Equal Protection Clause." *Valdez*, 2022 WL 2129071, at \*4 n.5.  The Supreme Court "held that the horse trainer's license was a property interest that warranted a post-deprivation hearing to satisfy the procedural due process requirements," but that "the horse training regulation did not violate equal protection even though the laws treated thoroughbred and harness racing differently." *Id.*  Thus, "the Court did not conclude the horse trainer had a fundamental right to pursue his chosen profession of horse training." *Id.*

Because Ms. Blackford does not have a fundamental right to work unvaccinated in a hospital or congregate care facility, the Court must evaluate her challenge to the August 2021 PHO under the rational basis standard.  *Id.* at \*5 ("Because the district court did not abuse its discretion in concluding the PHO does not infringe on a fundamental right that requires heightened scrutiny, it did not abuse its discretion by applying rational-basis review to the PHO.").  This conclusion is in keeping with that reached in the scores of cases holding that vaccine mandates do not implicate a fundamental right and that, as a result, rational basis review applies in determining the constitutionality of such mandates.  *Klaassen v. Trustees of Indiana Univ. ("Klaassen II")*, 7 F.4th 592 (7th Cir. 2021) (rejecting assertion by plaintiffs, who challenged Indiana University's mandatory COVID-19 vaccine requirement, that the rational basis standard does not offer enough protection for their interests, indicating that the court "must apply the law established by the Supreme Court" in *Jacobson v. Massachusetts,* 197 U.S. 11 (1905), which, in holding that "a state may require all members of the public to be vaccinated against smallpox," "shows that plaintiffs lack" a fundamental right to be free from mandatory vaccine measures); *We the Patriots*, 17 F.4th at 293 ("[T]he Supreme Court ha[s] consistently recognized that the Constitution embodies no fundamental right that in and of itself would render

18

vaccine requirements imposed in the public interest, in the face of a public health emergency, unconstitutional."); *Norris*, 567 F. Supp. 3d at 822 ("Over the last year and a half, courts have looked to *Jacobson* to infer that a rational basis standard applies to generally applicable vaccine mandates."); *Bauer*, 568 F. Supp. 3d at 594 (holding that vaccine mandates applicable to city, county, and fire district employees "must only bear a rational relationship to a legitimate government interest" in order to pass constitutional muster); *Baker*, 567 F. Supp. 3d at 326 ("*Jacobson* and recent cases show that declining a vaccine does not give rise to a fundamental right and rational basis scrutiny will apply") (collecting cases); *Andre-Rodney*, 569 F. Supp. 3d at 140 ("[B]ecause the Vaccine Mandate does not burden a fundamental right, it is subject to rational basis review."); *Klaassen I*, 549 F. Supp. 3d at 869 (collecting cases demonstrating "the consistent use of rational basis review to assess mandatory vaccination measures," and, in light of "a century's worth of rulings, declining to "extend substantive due process to recognize" a fundamental right to be free from COVID-19 vaccination requirements); *Harris v. Univ. of Mass.*, 557 F. Supp. 3d 304, 313 (D. Mass. Aug. 27, 2021) ("[T]he case [challenging a policy requiring students who seek to be on campus to be vaccinated prior to fall semester] "commends a deferential standard for analyzing Fourteenth Amendment challenges to generally applicable public health measures like the one here"); *Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 67 (2020) (Gorsuch, J., concurring) (explaining that *Jacobson* is "essentially . . . rational basis review").

"To satisfy the rational basis test, the [challenged governmental action] need only be rationally related to a legitimate government purpose." *Powers v. Harris,* 379 F.3d 1208, 1215 (10th Cir. 2004). Rational basis review "is highly deferential toward the government's actions. The burden is on the plaintiff to show the governmental act complained of does not further a

legitimate state purpose by rational means."  *Seegmiller v. LaVerkin City*, 528 F.3d 762, 772

(10th Cir. 2008).  The government's decision "must be upheld if any state of facts either known

or which could reasonably be assumed affords support for it.  Second-guessing by a court is not

allowed."  *Powers*, 379 F.3d at 1216-17.  Moreover, "rational-basis review does not give courts

the option to speculate as to whether some other scheme could have better regulated the evils in

question."  *Id.* at 1217.  The Court "will not strike down [governmental action] as irrational

simply because it may not succeed in bringing about the result it seeks to accomplish, or because

the statute's classifications lack razor-sharp precision."  *Id.*  Nor will the Court "overturn [an

order] on the basis that no empirical evidence supports the assumptions underlying the

[governmental] choice."  *Id.*  Indeed, the Court is "not bound by the parties' arguments as to

what legitimate state interests the [order] seeks to further," but instead "is obligated to seek out

other conceivable reasons for validating a state [order]."  *Id.*

The Court finds that the August 2021 PHO meets the rational basis test.  "Vaccination

requirements, like other public-health measures, have been common in this nation."  *Klaassen II*,

7 F.4th at 593.  In *Jacobson,* the Supreme Court held that "a community has the right to protect

itself against an epidemic of disease which threatens the safety of its members."  197 U.S. at 27.

Based on that premise, the Supreme Court declined to find unconstitutional, on either substantive

due process or equal protection grounds, a Cambridge, Massachusetts regulation that required all

adult inhabitants of that city, *without exception*, to be vaccinated against smallpox.  The Supreme

Court explained that "when the regulation in question was adopted smallpox, according to the

recitals in the regulation adopted by the board of health, was prevalent to some extent in the city

of Cambridge, and the disease was increasing."  *Id.*  The Court further explained that "in view of

the methods employed to stamp out the disease of smallpox," no one could "confidently assert

that the means prescribed by the state to that end has no real or substantial relation to the protection of the public health and the public safety." *Id.* at 31.  The Court noted that while it did "not decide, and [could not] decide, that vaccination is a preventive of smallpox," it took "judicial notice of the fact that this is the common belief of the people of the state, and, with this fact as a foundation," held that Cambridge's compulsory vaccine statute was "a health law, enacted in a reasonable and proper exercise of the police power." *Id.* at 35.  The Court then found that, since "vaccination, as a means of protecting a community against smallpox, finds strong support in the experience of this and other countries, no court . . . is justified in disregarding the action of the legislature simply because in its or their opinion that particular method was – perhaps, or possibly – not the best either for children or adults." *Id.*

In reaching its decision, the Supreme Court considered and rejected the defendant's "offers of proof" of "those in the medical profession who attach little or no value to vaccination as a means of preventing the spread of smallpox, or who think that vaccination causes other diseases of the body." *Id.* at 30.  The Court explained that it assumed that the legislature "was not unaware of these opposing theories," and that it was for the legislature, *and not the court*, to "determine which one of the two modes was likely to be the most effective for the protection of the public against disease." *Id.*  Indeed, the Court explained that the legislature "could not properly abdicate its function to guard the public health and safety," and thus was compelled, of necessity, to choose between opposing theories on how best to "meet and suppress the evils of a smallpox epidemic that imperiled an entire population." *Id.* at 30-31.  The Court emphasized that the "possibility that the belief [in the efficacy of vaccines] may be wrong, and that science may yet show it to be wrong," was "not conclusive; for the legislature has the right to pass laws

which, according to the common belief of the people, are adapted to prevent the spread of contagious diseases." *Id.* at 35.

Ultimately, the Court refused to allow the defendant to "claim [] an exemption" from the vaccination statute based on his offers of proof regarding the "evil" of vaccines, as doing so would "strip the legislative department of its function to care for the public health and the public safety when endangered by epidemics of disease." *Id.* at 37.  And in so refusing, the Court noted that it was "not prepared to hold that a minority, residing or remaining in any city or town where smallpox is prevalent, and enjoying the general protection afforded by an organized local government, may thus defy the will of its constituted authorities, acting in good faith for all, under the legislative sanction of the state." *Id.*  The Court concluded:  "We are unwilling to hold it to be an element in the liberty secured by the Constitution of the United States that one person, or a minority of persons, residing in any community and enjoying the benefits of its local government, should have the power thus to dominate the majority when supported in their action by the authority of the state." *Id.*

With its decision in *Jacobson*, the Supreme Court "settled that it is within the police power of a state to provide for compulsory vaccination." *Zucht v. King*, 260 U.S. 174, 176, (1922).  "[F]or over 100 years [*Jacobson*] has stood firmly for the proposition that the urgent public health needs of the community can outweigh the rights of an individual to refuse vaccination.  *Jacobson* remains binding precedent." *We the Patriots*, 17 F.4th at 294 n.35.  In the context of the current pandemic, courts consistently have applied *Jacobson* to find that mandatory vaccine policies meet the rational basis test.  *See, e.g., Baker*, 567 F. Supp. 3d at 327 (finding that vaccine mandate was "a rational way [to] attain" the compelling interest of "stemming the spread of COVID-19"); *Bauer*, 568 F. Supp. 3d at 592 (noting that "numerous

22

courts have recognized that preventing the spread of COVID-19 provides a rational justification

for vaccine mandates."); *Maniscalco*, 563 F. Supp. 3d at 39 ("Ultimately, even if plaintiffs

disagree with it, the [vaccine mandate] at issue represents a rational policy decision surrounding

how best to protect children during a global pandemic."); *Johnson v. Brown*, 567 F. Supp. 3d

1230, 1253 (D. Ore. 2021) ("The decision to require vaccination among state executive agency

employees, and critical populations such as healthcare workers and providers and education

workers and volunteers, is a rational way to further the State's interest in protecting health and

safety during the COVID-19 pandemic."); *Brnovich*, 562 F. Supp. 3d at 163 (holding that

plaintiffs' substantive due process challenge failed because federal contractor vaccine mandate

was rationally related to legitimate interest of inhibiting spread of COVID-19); *Klaassen I*, 549

F. Supp. 3d at 873 (noting that, in light of the fact that the "vaccination campaign has markedly

curbed the pandemic," "Indiana University insisting on vaccinations for its campus

communities," thereby "stemming illness, hospitalizations, or deaths at the university level[,]

hardly proves irrational"); *Harris,* 557 F. Supp. 3d at 313 (holding that university's decision to

mandate vaccines was based "upon both medical and scientific evidence and research and

guidance, and thus is at least rationally related to" the "legitimate interests" of curbing the spread

of COVID-19 and "returning students safely to campus"); *America's Frontline Doctors v.*

*Wilcox*, No. 21-EDCV-1243, 2021 U.S. Dist. LEXIS 144477 (C.D. Cal. July 30, 2021) (holding

that "there is clearly a rational basis for Defendants to institute the Policy requiring vaccination"

to further the goal of facilitating the "protection of the health and safety of the University

community").

     Applying *Jacobson* to the August 2021 PHO at issue here, this Court reaches the same

conclusion.  The governmental purpose of stemming the spread of COVID-19, especially in the

wake of the many variants that have mutated from the original virus, is not only legitimate, but is

"unquestionably a compelling interest." *Roman Cath. Diocese of Brooklyn*, 141 S. Ct. at 67.

"[R]equiring those who work in healthcare settings to be vaccinated is rationally related to the

furtherance of that interest." *Andre-Rodney*, 569 F. Supp. 3d at 140.  Vaccination is "one of the

most highly regarded" tools "to reduce viral transmission." *Maniscalco*, 563 F. Supp. 3d at 40.

"There is evidence that vaccines provide more robust protection than antibodies from a previous

COVID-19 infection" and "reduce the potential for hospitalization as compared to the

unvaccinated population." *Id.* at 40-41.  Even with the prevalence of the new variants, the CDC

continues to advise that COVID-19 vaccines remain the best way to protect the community.  As

noted above, the August 2021 PHO specifically indicates that the vaccine requirements set forth

therein are based on the following scientific and medical evidence:  "the currently available

COVID-19 vaccines are safe and the most effective way of preventing infection, serious illness,

and death"; "widespread vaccination protects New Mexico's health care system as vaccines

decrease the need for emergency services and hospitalization"; and "the refusal to receive the

COVID-19 vaccine not only endangers the individual but the entire community, and further

jeopardizes the progress the State has made against the pandemic by allowing the virus to

transmit more freely and mutate into more transmissible or deadly variants."  Doc. 1-2.

Other legitimate goals follow from the governmental purpose of stemming the spread of

COVID-19, especially in the wake of highly contagious variants, including:  (1) protecting

"persons who may be extremely vulnerable to the virus and at high risk for poor outcomes" and

"individuals who are not able to get vaccinated due to a contraindication . . . or persons who may

be severely immunocompromised and not able to mount an effective immune response to the

vaccine"; and (2) "significantly reduc[ing] the transmission of this virus from person to person"

in order to "decrease the likelihood" of "new mutations in the viral genome that could possibly lead to more severe disease or even the ability to evade the current vaccines and anti-viral therapeutics."   Doc. 13-1 ¶¶ 14, 20-21, 26.  Following the research, recommendations, and guidance of  several medical and scientific sources, including the CDC, the American Academy of Pediatrics, the American Academy of Family Practice, the Infectious Diseases Society of America, the New Mexico state public health lab, University of New Mexico, Los Alamos National Lab, and the Advisory Committee on Immunization Practices, Defendants have determined that the vaccines – which are "extremely safe" and "highly effective" –  "are the best tool we have to protect individuals and protect communities from [COVID-19]."  Doc. 13-1 ¶¶ 15, 28.  Notably, based on the scientific and medical research, Defendants have determined that vaccinating health care personnel is the "best tool" to protect patients who come into close contact with them – patients who "may be extremely vulnerable to the virus and at high risk for poor outcomes."  *Id.* ¶ 14.  Similarly, Defendants have determined that "the most effective way to stop transmission" to "individuals who are not able to get vaccinated" "is to vaccinate eligible family members and those in the community where they live."  *Id.* ¶¶ 20-21.  Further, Defendants have determined that "[t]he best tool we have" to decrease the likelihood that new, more lethal mutations of the virus develop "is through protecting as many people as possible by vaccination."  *Id.* ¶ 26.  Finally, Defendants have determined that "the immunity provided by vaccines may be more long-lasting compared to immunity gained following infection."  *Id.* ¶ 39.

The requirements set forth in the August 2021 PHO, thus grounded in medicine and science, are rationally related to Defendants' legitimate purpose of protecting the community "against an epidemic of disease [that] threatens the safety of its members."  *Jacobson*, 197 U.S. at 27.  Since *Jacobson* was decided, the "methods employed to stamp out" diseases have

25

continued to include vaccination, which, "as a means of protecting a community against

smallpox[, other diseases, and now, COVID-19], finds strong support in the experience of this

and other countries." *Id.* Accordingly, no one could "confidently assert that the means

prescribed by the state" to prevent the spread of COVID-19, namely, requiring certain

individuals to be vaccinated, has "no real or substantial relation to the protection of the public

health and the public safety." *Id.* at 31. It follows that the August 2021 PHO was "enacted in a

reasonable and proper exercise of [Defendants'] police power." *Id.* at 35. Indeed, "this case is

easier than *Jacobson*," as the August 2021 PHO "does not require every adult member of the

public to be vaccinated, as Massachusetts did in *Jacobson*," but rather is targeted to those

individuals most likely to impact vulnerable populations and allows for reasonable

accommodations. *Klaassen II*, 7 F.4th at 593.

    Plaintiffs' attempts to circumvent *Jacobson* are unavailing. Plaintiffs characterize the

COVID-19 vaccines as "gene modification therapies," Doc. 20 at 10, but provide no medical

authority to distinguish the COVID-19 mRNA vaccines from any other vaccines; indeed, public

health information is to the contrary, as "the CDC has clearly opined that the [vaccines against

COVID-19] constitute 'vaccines.'" *Messina v. College of New Jersey*, 566 F. Supp. 3d 236, 248

(D.N.J. 2021); *accord, Smith v. Biden*, 21-cv-19457, 2021 WL 5195688, at *6 (D.N.J. Nov. 8,

2021) (rejecting argument that *Jacobson* does not apply because "the COVID-19 vaccines are

not actual vaccines"); *Johnson*, 567 F. Supp. 3d at 1249 (rejecting argument that *Jacobson* and

the cases following it are irrelevant "because they either were not considering an 'experimental'

vaccine or did not properly consider that the vaccine was not yet approved by the FDA," as such

facts are not "dispositive on the standard of review"). In response to the specific question, "Is

the mRNA vaccine considered a vaccine?" the CDC states: "Yes. mRNA vaccines, such as

Pfizer-BioNTech and Moderna, work differently than other types of vaccines, but they still trigger an immune response inside your body.  This type of vaccine is new, but research and development on it has been under way for decades." *Messina,* 566 F. Supp. 3d. at 248 (quoting Centers for Disease Control and Prevention, "Myths and Facts about COVID-19 Vaccines"). And as described above, "other courts – including this one – [have] reviewed similar challenges to COVID-19 vaccine policies and have uniformly concluded that *Jacobson* controls." *Id.*; *see Legaretta v. Macias*, __ F. Supp. 3d __, 2022 WL 1443014, at *11 (D.N.M. May 6, 2022).

   Plaintiffs also call into question the efficacy of the COVID-19 vaccines.  *See* Doc. 1 ¶ 13 ("Covid-recovered individuals have equal to or better immunity response than vaccinated individuals."); Doc. 20 at 9 ("[T]he vaccinated are as susceptible to contracting the disease and spreading the disease as the unvaccinated."); *Id.* at 9-10 ("There is no documentation that other treatments were not available … that work to treat Covid and slow its spread.").  But "even if there is vigorous ongoing discussion about the effectiveness of natural immunity, it is rational for [Defendants] to rely on present federal and state guidance in creating its vaccine mandate." *Norris*, 567 F. Supp. 3d at 822.  And Plaintiffs' "disputes over the most reliable science" are of no moment, as "the court doesn't intervene so long as [Defendants'] process is rational in trying to achieve public health." *Klaassen I*, 549 F. Supp. at 888 (citing *Phillips v. City of New York*, 775 F.3d 538, 542 (2d Cir. 2015) ("[P]laintiffs argue that a growing body of scientific evidence demonstrates that vaccines cause more harm to society than good, but as *Jacobson* makes clear, that is a determination for the [policymaker], not the individual objectors.")); *Johnson*, 567 F. Supp. 3d at 1253 ("[T]he issue before the Court is not to analyze the safety of the vaccines or whether the Vaccine Orders are the best (or even a good) policy.").

As did the Court in *Jacobson*, this Court assumes that Defendants are aware of "opposing theories" on the efficacy of vaccines; and as did the Court in *Jacobson*, this Court finds, as it must, that it is for Defendants, and not the Court, to determine what "[is] likely to be the most effective [mode] for the protection of the public against disease." *Jacobson*, 197 U.S. at 30. Indeed, this is so regardless of whether "science may yet show" Defendants' belief in the efficacy of the COVID-19 vaccines "to be wrong," as Defendants have the right to enact directives "adapted to prevent the spread of contagious diseases." *Id.* "The Court cannot reasonably conclude that [Defendants'] arguments in favor of vaccination were not made in good faith, or that they are irrational." *Maniscalco*, 563 F. Supp. 3d at 41. Accordingly, "[s]ubstantive due process [] requires the Court to afford deference to [D]efendants' weighing of the competing concerns." *Id.* This is "especially so" where, as here, Defendants are exercising their "police powers to mitigate harm in a public health emergency." *Johnson*, 567 F. Supp. 3d at 1253 (citing *South Bay United Pentecostal Church v. Newsom*, 140 S. Ct. 1613, 1613-14 (2020) (Roberts, CJ., concurring) ("When [public] officials undertake to act in areas fraught with medical and scientific uncertainties, their latitude must be especially broad. Where those broad limits are not exceeded, they should not be subject to second-guessing by an unelected federal judiciary, which lacks the background, competence, and expertise to assess public health and is not accountable to the people.")).

For these reasons, the August 2021 PHO meets the rational basis test. *See Valdez*, 2022 WL 2129071, at *5 (upholding this Court's finding that the August 2021 PHO was likely rationally related to a legitimate government purpose because that finding "was supported by Supreme Court precedent and evidence in the record"). Accordingly, Plaintiffs have failed to state a substantive due process claim.

28

III.   <u>Equal Protection Claims</u>

Plaintiffs allege that Defendants are violating their equal protection rights because their "actions create a class of individuals who . . . are punished for being unvaccinated and discriminated against without any real justifiable basis and without providing them any alternative," and "[t]he PHO is <u>not</u> rationally related to achieving a compelling government purpose." Doc. 1 ¶¶ 59, 60 (emphasis in original). "Equal protection is essentially a direction that all persons similarly situated should be treated alike." *Dalton v. Reynolds*, 2 F.4th 1300, 1308 (10th Cir. 2021) (citation omitted). "In order to assert a viable equal protection claim, plaintiffs must first make a threshold showing that they were treated differently from others who were similarly situated to them." *Barney v. Pulsipher*, 143 F.3d 1299, 1312 (10th Cir. 1998)). "Upon this showing, [plaintiffs] must then demonstrate that the state actor's differential treatment of [them] cannot pass the appropriate standard of scrutiny." *Dalton,* 2 F.4th at 1308.

"Different types of equal protection claims call for different forms of review." *Id.* "[U]nless a legislative classification either burdens a fundamental right or targets a suspect class, it need only bear a rational relation to some legitimate end to comport with equal protection." *Curley v. Perry*, 246 F.3d 1278, 1285 (10th Cir. 2001) (citation omitted). As discussed above, the August 2021 PHO does not burden a fundamental right. Nor does it target a suspect class, as it does not "categorize persons based on suspect classifications, such as race and national origin," or "on 'quasi-suspect' classifications, such as gender and illegitimacy." *Save Palisade FruitLands v. Todd*, 279 F.3d 1204, 1210 (10th Cir. 2002) (citations omitted). Accordingly, the Court applies rational basis review, asking "whether the government's classification bears a rational relation to some legitimate end." *Dalton*, 2 F.4th at 1308.

29

As explained above in the context of Plaintiffs' substantive due process claims, the August 2021 PHO meets the rational basis test.  The August 2021 PHO, including its classification of individuals as to whom vaccination requirements apply, is grounded in medicine and science, and thus is rationally related to Defendants' legitimate purpose of protecting our community "against an epidemic of disease [that] threatens the safety of its members." *Jacobson*, 197 U.S. at 27.  Accordingly, Plaintiffs have failed to state a claim that the August 2021 PHO violates their equal protection rights.

IV.   Procedural Due Process Claims

Plaintiffs allege that the August 2021 PHO deprives them of "fundamental liberties without due process of law."  Doc. 1 ¶ 73; *see also* Doc. 20 at 3 ("Plaintiff Blackford has plausibly alleged and verified that she has [a] protected property interest to engage in her chosen profession.").  Because the August 2021 PHO, however, "is generally applicable" to all congregate care facility workers, hospital workers, school workers, State Fair attendees, and Governor's office staff, Plaintiffs "are not entitled to [process] above and beyond the notice provided by the enactment and publication of the [PHO] itself."  *Harris,* 557 F. Supp. 3d at 312 (citation omitted); *see also United States v. Locke*, 471 U.S. 84, 108 (1985) ("In altering substantive rights through enactment of rules of general applicability, a legislature generally provides constitutionally adequate process simply by enacting the statute, publishing it, and, to the extent the statute regulates private conduct, affording those within the statute's reach a reasonable opportunity both to familiarize themselves with the general requirements imposed and to comply with those requirements."); *Oklahoma Educ. Ass'n v. Alcoholic Beverage Laws Enforcement Comm'n*, 889 F.2d 929, 936 (10th Cir. 1989) ("When the legislature passes a law which affects a general class of persons, those persons have all received procedural due process –

30

the legislative process."); *Curlott v. Campbell*, 598 F.2d 1175, 1181 (9th Cir. 1979) ("[W]e doubt

very much that procedural due process prior to reduction of benefits is required when an agency

makes a broadly applicable, legislative-type decision.").  Based on this principle, courts in this

district have held that the public health orders issued by Defendants in response to the current

pandemic do not implicate procedural due process.  *See Hernandez v. Lujan Grisham*, 508 F.

Supp. 3d 893, 977-981 (D.N.M. 2020); *Peterson v. Kunkel*, 492 F. Supp. 3d 1183, 1197-98

(D.N.M. 2020).  This Court agrees.  Accordingly, Plaintiffs have failed to state a claim that the

August 2021 PHO violates their procedural due process rights.

V.      Claims under Article I, Section 10 of the United States Constitution

        Plaintiffs allege that Defendants' vaccine requirements "constitute[] a bill of attainder"

and "impair" the contract entered into between Valdez and her children "to participate in the

New Mexico State Fair junior livestock competitions" and Blackford's "employment contract,"

in violation of Article I, Section 10 of the United States Constitution.  Doc. 1 ¶¶ 75-76; *see also*

Doc. 20 at 8 ("Defendants' PHO unequivocally destroys . . . the employment contract of Plaintiff

Blackford by requiring her employer terminate her or prevent her from work to remain compliant

with the PHO and it destroyed the contract of every unvaccinated child to exhibit livestock at the

State Fair by making performance impossible by prohibiting their entry onto the Fair grounds.").

In their reply brief in support of their request for a preliminary injunction, Plaintiffs indicated

their abandonment of the theory that the August 2021 PHO constitutes a bill of attainder,

referring to Defendants' arguments refuting that theory as "a complete red herring."  Doc. 14 at

7.  Plaintiffs do not attempt to revive their bill of attainder theory in their Response to

Defendants' Motion to Dismiss.   Accordingly, the Court will consider only Plaintiffs' remaining

argument under the Contracts Clause of Article I, Section 10 of the United States Constitution,

namely that Defendants have impaired Plaintiffs' existing contracts by enacting the August 2021 PHO.  *Id.* at 8-9.

"The Contracts Clause restricts the power of States to disrupt contractual arrangements." *Sveen v. Melin*, 138 S. Ct. 1815, 1821 (2018).  It provides that "[n]o state shall . . . pass any . . . Law impairing the Obligation of Contracts." *Id.* (quoting U.S. Const., Art. I, § 10, cl. 1). Not all laws affecting pre-existing contracts, however, violate the Clause.  *Sveen*, 138 S. Ct. at 1821.  The Supreme Court has articulated a "two-step test" to determine "when such a law crosses the constitutional line." *Id.*  First, the Court asks whether the state law has "operated as a substantial impairment of a contractual relationship." *Id.* at 1822.  In answering that question, the Court considers "the extent to which the law undermines the contractual bargain, interferes with a party's reasonable expectations, and prevents the party from safeguarding or reinstating his rights." *Id.*  "If such factors show a substantial impairment," the Court next asks "whether the state law is drawn in an 'appropriate' and 'reasonable' way to advance 'a significant and legitimate public purpose.'" *Id.* (quoting *Energy Reserves Group, Inc. v. Kansas Power & Light Co.,* 459 U.S. 400, 411–412 (1983)).

Here, Plaintiffs have failed to establish a "substantial impairment" of any contractual relationship.  Plaintiffs have not provided the Court with copies of any of the purported contracts at issue or cited to any provisions therein to demonstrate that the August 2021 PHO undermines their contractual bargain, interferes with their reasonable expectations, or prevents them from safeguarding or reinstating their rights.  And indeed, the evidence available to the Court demonstrates to the contrary.

First, as Plaintiffs concede, Ms. Blackford's employer, Presbyterian, has instituted its own private vaccine mandate – a mandate that reaches more broadly than does the August 2021

32

PHO – requiring its entire workforce to be vaccinated against COVID-19 in the absence of a qualifying exemption.  Colleen Heild, *Presbyterian requires vaccines for entire workforce of 13,000*, Santa Fe New Mexican (Aug. 18, 2021), https://www.abqjournal.com/2420650/ presbyterian-requires-vaccines-for-entire-workforce-of-13000-ex-pnm-is-asking-all-staff-to-get-vaccinated-or-be-tested-weekly.html.  Plaintiffs contend that it is "disingenuous and unsubstantiated" to believe that Presbyterian "would have imposed that condition on those contracts regardless of the requirement of the PHO that they do so," Doc. 20 at 9, but there is no support for this contention, as the August 2021 PHO applies directly to individual workers rather than to the hospitals that employ them.  Nor is there any indication that, but for the August 2021 PHO, Presbyterian would not have instituted its own vaccine requirements.  Notably, commenting on its mandate, Presbyterian's president and CEO, Dale Maxwell, stated, "We take care of some of the most vulnerable people in the state of New Mexico, . . . and I believe . . . we should take every measure possible to deliver the safest environment."  *Id.*  Maxwell further stated that Presbyterian made its own independent decision "to also include all other Presbyterian employees, including clinical, clerical and health plan employees," because "we believe at Presbyterian that vaccines are the best way to combat this pandemic . . . We know that vaccines reduce the spread of the infection and we know that vaccines reduce the illness of those that contract COVID-19.  Any action to increase vaccines in our community, we support."  *Id.*

Further, as the Tenth Circuit indicated, "the Center for Medicare and Medicaid Services ("CMS") [has since] issued an interim final rule with comment period ("IFC") requiring staff at Medicare and Medicaid-certified hospitals to be vaccinated."  *Valdez*, 2022 WL 2129071, at *2 (citing 86 Fed. Reg. 61555, 61570–71 (Nov. 5, 2021)).  The Supreme Court upheld the IFC in *Biden v. Missouri*, 142 S. Ct. 647, 653 (2022).  *Valdez*, 2022 WL 2129071, at *2.  Because

"Presbyterian is Medicare and Medicaid-certified, it is governed by CMS and the IFC." *Id.*

Given Presbyterian's mandate and the IFC, Ms. Blackford has no "reasonable expectation" that

she would be entitled to continue her employment without being vaccinated, and thus cannot

claim that the August 2021 PHO substantially impairs her contractual rights.

Similarly, although Plaintiffs allege that Ms. Valdez was deprived of the benefit of her

contract with Expo New Mexico because her children could not participate in the New Mexico

State Fair junior livestock competitions, Expo New Mexico cancelled the 2021 New Mexico

State Fair Junior Livestock Shows and Sale. *See* New Mexico State Fair website, https://

statefair.exponm.com/p/participate/competitions/livestock-shows.   The website indicates that

Expo New Mexico was "issuing full refunds of all fees to our exhibitors," and provided a form

on its website for individuals who had contracted to attend to make their request for a refund. *Id.*

Because Ms. Valdez thus was entitled to a refund of the consideration that she paid for her

children to participate in the State Fair, the August 2021 PHO did not undermine her contractual

bargain.

Further, Ms. Valdez and her children were still able to show their animals, as the New

Mexico Youth Livestock Expo went forward in Roswell, welcoming all entries free of charge

and in an unlimited number.  *See* New Mexico Youth Livestock Expo Facebook page, https:

//www.facebook.com/NMJLF1989/photos/pb.181295355267698.2207520000../4601143193282

870/?type=3&theater.   The fact that Ms. Valdez and her children did, in fact, exhibit their

animals in the New Mexico Youth Livestock Expo negates Plaintiffs' claim that the August 2021

PHO "destroyed" their contract to exhibit livestock.  Karin Brulliard, *A Vaccine mandate*

*fractures a state fair, leaving children as 'pawns'*, The Washington Post (Sept. 26, 2021),

https://www.washingtonpost.com/2021/09/26/covid-public-vaccine-mandates/ (containing image

of Ms. Valdez with her daughters at the Youth Livestock Show in Roswell).

Even if Plaintiffs were able to show a substantial impairment of a contractual relationship, their claim under the Contracts Clause would fail because, just as it meets the rational basis test, the August 2021 PHO is drawn in an appropriate and reasonable way to advance a significant and legitimate public purpose.  For these reasons, Plaintiffs have failed to state a claim that the August 2021 PHO violates the Contracts Clause of Article I, Section 10 of the United States Constitution.

## VI.   The Court Will Not Decide Plaintiffs' Pendent State Law Claims.

In addition to their federal claims, Plaintiffs assert claims arising from New Mexico law, namely, that by requiring individuals to be vaccinated "to maintain employment or enjoy the benefits of an existing contract," Defendants are violating Plaintiffs' rights "secured by the New Mexico Constitution," and that such violation "is actionable under the New Mexico Civil Rights Act [("NMCRA")]."  Doc. 1 ¶¶ 81, 86.  The Court's pendent jurisdiction over such state law claims "is exercised on a discretionary basis," and the Tenth Circuit has generally held that "if federal claims are dismissed before trial, leaving only issues of state law, the federal court should decline the exercise of jurisdiction by dismissing the case without prejudice."  *Brooks v. Gaenzle*, 614 F.3d 1213, 1229 (10th Cir. 2010) (citations omitted).  The Tenth Circuit has explained its general disinclination "to exercise pendent jurisdiction in such instances because notions of comity and federalism demand that a state court try its own lawsuits, absent compelling reasons to the contrary."  *Id.* at 1230 (citations omitted).

Having determined that Plaintiffs' federal claims are subject to dismissal, the only remaining issue is whether Defendants violated the New Mexico Constitution. The Court finds that this issue is best left for a state court's determination.  *Id.* at 1230.  Accordingly, the Court

declines to exercise supplemental jurisdiction over Plaintiff's remaining state law claims and will dismiss them without prejudice.

## CONCLUSION

Plaintiffs have failed to state a claim upon which relief can be granted on any of their claims allegedly arising under federal law, namely, their FDCA claims, their substantive due process claims, their equal protection claims, their procedural due process claims, and their contractual impairment claims.  As a result, those claims will be dismissed with prejudice, and the Court need not reach the issue of qualified immunity.  The Court declines to exercise supplemental jurisdiction over Plaintiffs' state law claims and, accordingly, those claims are dismissed without prejudice.

IT IS THEREFORE ORDERED that Defendants' Motion to Dismiss Plaintiffs' Verified Complaint [Doc. 17] is GRANTED, as follows:  Plaintiffs' federal law claims, as set forth in Counts I through V, are dismissed with prejudice and Plaintiffs' state law claims, as set forth in Count VI, are dismissed without prejudice.

DATED this 19th day of August 2022.

_____
MARTHA VÁZQUEZ
Senior United States District Judge